## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Steady State Imaging, LLC,

Case No. 0:17-cv-01048-JRT-KMM

Plaintiff,

**REPORT AND**
**RECOMMENDATION**

v.

General Electric Company,

Defendant.

Devan V. Padmanabhan, Lisa B. Ellingson, and Paul J. Robbennolt, Winthrop & Weinstine, PA, counsel for plaintiff

Marla Butler and Nicole S. Frank, Robins Kaplan LLP, counsel for defendant

General Electric Company ("GE") moves to dismiss three of the four claims asserted in Steady State Imaging's ("SSI") Amended Complaint. Def.'s Mot., ECF No. 24. Based on the parties' written arguments, the arguments of counsel at the hearing, and on the entire record, the Court recommends that GE's motion be granted in part and denied in part.

## I.    The Amended Complaint

This case involves disagreements over a transaction in which GE purchased SSI's exclusive rights to a new MRI technology originally developed by the University of Minnesota. Generally speaking, SSI takes the position that GE was required to do more to commercialize the MRI technology, which would have led to additional payments to SSI under the parties' agreement. SSI also takes the position that after the parties entered a written asset purchase agreement, GE promised SSI that GE would commercialize the technology, which caused SSI to make additional investments to assist in that commercialization. GE contends that the asset purchase agreement's

1

plain language forecloses any claim that GE was required to do more to commercialize the new MRI technology. GE further argues that SSI's allegations concerning oral promises are implausible.

### The License Agreement

Using research grants in 1998 and 2003 from the National Institutes of Health, a team at the University of Minnesota developed a new MRI technology known as SWIFT. Am. Compl. ¶¶ 6-13. The University obtained several patents and filed a number of patent applications related to SWIFT. *Id.* ¶ 12.

In December 2006, as part of its focus on advancing the development of MRI technologies, SSI entered an Exclusive Patent License Agreement with the University. This License Agreement gave SSI the exclusive right to commercialize SWIFT technology. Am. Compl. ¶¶ 15-17. SSI also obtained the power to sublicense or assign its rights under the License Agreement. *Id.* ¶ 18. The License Agreement required SSI to "use its commercially reasonable efforts, consistent with sound and reasonable business practices and judgment, to commercialize the [SWIFT technology] as soon as practicable and to maximize sales thereof." *Id.* ¶ 19. For the next several years, SSI "used its best efforts to develop and commercialize SWIFT." *See id.* ¶ 20.

### The Asset Purchase Agreement

In April 2011, GE and SSI "entered into an Asset Purchase Agreement (the 'APA'), pursuant to which GE purchased substantially all of the assets of SSI." Am. Compl. ¶ 21. "SSI assigned to GE, and GE assumed, all of SSI's rights and liabilities under the Patent License Agreement." *Id.* ¶ 21.

SSI asserts that as a result of GE's assumption of the License Agreement, "GE was required to 'use its commercially reasonable efforts, consistent with sound and reasonable business practices and judgment, to commercialize the [SWIFT technology] as soon as practicable and to maximize sales thereof." Am. Compl. ¶ 23. SSI also alleges that GE was required to pursue a research and development program

2

(referred to as an "ATD Program") and a marketing program (referred to as an "NPI Program") for the SWIFT technology. *See id.* ¶¶ 24-25 (describing the ATD and NPI Programs). GE's commercialization of SWIFT technology is particularly important to SSI because the APA provides that GE would make additional payments to SSI (in excess of the significant purchase price) if GE sells certain products that use the SWIFT technology. *Id.* ¶ 26.

Paragraph 2.2 of the APA addresses GE's obligations to: (1) commercialize SWIFT technology; (2) develop an ATD Program; and (3) develop an NPI Program. In relevant part, Paragraph 2.2 provides that:

> [GE] shall have no obligation to pursue the commercialization of any Additional Payment Product or use any specific level of efforts if [GE] chooses to commercialize any Additional Payment Product. Notwithstanding the preceding sentence, (1) following the Closing, [GE] shall create, in accordance with its standard policies and procedures, an ATD Program with respect to the SWIFT Technology and (2) if, following the completion of the ATD Program, [GE] determines in its sole discretion than an NPI Program is appropriate for any product using the SWIFT Technology, [GE] shall create, in accordance with its standard policies and procedures, an NPI Program with respect to such product.

APA ¶ 2.2(a)(iv)(D), ECF No. 28; *see also* Am. Compl. ¶¶ 24-25. An "Additional Payment Product" is defined in the APA to include SWIFT-based MRI scanners and certain conventional MRI scanners incorporating SWIFT-based applications. APA ¶ 9.1.

SSI alleges that "GE did not, and has not to date, created an ATD Program with respect to the SWIFT Technology." Am. Compl. ¶ 28. Instead, "GE prioritized is own internally-developed 'Silent Scan' technology over SWIFT" even though "SWIFT has many advantages over GE's Silent Scan technology." *Id.* ¶¶ 29, 31. SSI asserts that "GE had ulterior motives in failing to commercialize the SWIFT Technology or create an ATD Program with respect to the SWIFT Technology." *Id.* ¶ 32. Specifically, GE favored commercialization of Silent Scan technology "to avoid

making additional payments to SSI under the APA." *Id.* ¶ 33. SSI further alleges that GE acted dishonestly and in bad faith by favoring its Silent Scan technology, failing to commercialize SWIFT, and failing to create an ATD Program. *Id.* ¶ 34.

### GE's Alleged Post-APA Promises

After the parties executed the APA in April 2011, "SSI repeatedly asked GE for updates on its commercialization efforts and asked GE to commercialize the SWIFT technology." Am. Compl. ¶ 35. In response, "GE repeatedly promised SSI that GE would commercialize the SWIFT Technology." *Id.* ¶ 36. "For example, in September 2014, Jason Polzin and Baldev Ahluwalia of GE promised to Danny Cunagin of SSI that GE would commercialize the SWIFT Technology." *Id.* ¶ 37. "In exchange for GE's promises to commercialize the SWIFT Technology, SSI made investments to assist with that commercialization and refrained from taking action to enforce the APA or to reacquire rights to the SWIFT Technology." *Id.* ¶ 38. Further, SSI states that by making these promises "GE intended to induce" SSI's reliance on them. *Id.* ¶ 39. And finally, SSI asserts that it "relied on GE's promises to its detriment when it decided to make investments to assist with SWIFT commercialization and refrain from taking action to enforce the APA or to reacquire rights to the SWIFT Technology." *Id.* ¶ 40.

In the context of GE's motion to dismiss, these alleged post-APA promises must be considered against the backdrop of a provision of the APA that requires modifications of the agreement to be in writing. This no-oral-modification language appears in an integration clause, which provides as follows:

> This Agreement and the Exhibits and Schedules referred to herein and the documents delivered pursuant hereto contain the entire understanding of the parties hereto with regard to the subject matter contained herein or therein, and supersede all prior agreements, understandings or letters of intent between or among any of the parties hereto, including the Letter of Intent, the Exclusivity Agreement and the Confidentiality Agreement. *This Agreement shall not be amended, modified or*

*supplemented except by a written instrument signed by an authorized representative of each of the parties hereto.*

APA ¶ 8.7 (emphasis added).

**SSI's Claims**

SSI raises its claims in four separate "Counts" in its Amended Complaint. In Count I, SSI claims that GE breached the APA by failing to use its commercially reasonable efforts to commercialize the SWIFT Technology and to maximize sales of products incorporating the technology. Am. Compl. ¶ 44. SSI also alleges that GE breached the APA by failing to create an ATD Program with respect to the SWIFT Technology. *Id.* ¶ 45. GE has not moved to dismiss this claim for breach of contract.

In Count II, SSI asserts that GE breached an implied covenant of good faith and fair dealing by failing to use its commercially reasonable efforts to commercialize the SWIFT Technology. Am. Compl. ¶ 49. Further, SSI asserts that "GE also breached the implied covenant of good faith and fair dealing by failing to exercise its discretion to determine whether an NPI program was warranted with respect to the SWIFT Technology in a reasonable manner." *Id.* ¶ 50.

In Count III, SSI alleges that when GE made promises to it after the parties executed the APA, they formed a new oral contract. Am Compl. ¶ 53. "In exchange for GE's promises to commercialize the SWIFT Technology, SSI made investments to assist with that commercialization and refrained from taking action to enforce the APA or reacquire rights to the SWIFT Technology." *Id.* ¶ 54. SSI alleges that GE breached this second agreement by failing to commercialize the SWIFT Technology, causing SSI to suffer damages. *Id.* ¶¶ 56-57.

Finally, based on the same allegations comprising Count III, SSI asserts a claim for promissory estoppel. Am. Compl. ¶¶ 59-63. SSI alleges that: GE intended to induce SSI to rely on its post-APA promises to commercialize SWIFT; SSI reasonably relied on those promises when it made investments to assist with the

commercialization and refrained from enforcing the APA or reacquiring rights to the SWIFT Technology; and GE did not comply with its promises. *Id.* ¶¶ 60-61.

## II.   Discussion

GE asserts that under Federal Rule of Civil Procedure 12(b)(6), SSI has failed to state a claim in Counts II, III, and IV of the Amended Complaint. To survive a motion to dismiss for failure to state a claim "'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 668 (2009)). "A claim has facial plausibility when the plaintiff [has pleaded] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "[L]abels and conclusions or a formulaic recitation of the elements of a cause of action" are not sufficient to state a claim. *Id.* (citation and quotation marks omitted). Instead, the Court "must accept [the] plaintiff's specific factual allegations as true but [need] not . . . accept a plaintiff's legal conclusions." *Brown v. Medtronic, Inc.*, 628 F.3d 451, 459 (8th Cir. 2010) (citing *Twombly*, 550 U.S. at 556).

Applying these standards, the Court concludes that SSI has failed to state a claim for breach of the implied covenant of good faith and fair dealing and Count II of the Amended Complaint should be dismissed. The Court also concludes that SSI has sufficiently alleged facts giving rise to a claim for breach of an oral contract formed after the parties entered the Asset Purchase Agreement. And finally, the Court concludes that SSI has adequately pled an alternative claim for promissory estoppel based on the same facts giving rise to its breach of an oral contract claim. Accordingly, the Court recommends that GE's motion to dismiss be denied with respect to Counts III and IV of the Amended Complaint.

### A. Count II - Breach of Implied Covenant of Good Faith and Fair Dealing

"Minnesota law implies a covenant of good faith and fair dealing into every contract." *U.S. Bank Nat'l Ass'n v. San Antonio Cash Network*, __ F. Supp. 3d __, 2017 WL 2198191, at *5 (D. Minn. 2017) (citing *In re Wren*, 699 N.W.2d 758, 765 n.10 (Minn. 2005)). This covenant serves only "to enforce existing contractual duties, and not to create new ones." *Allen v. Thom*, No. A07-2088, 2008 WL 2732218, at *5 (Minn. Ct. App. July 15, 2008).

To state a claim for a breach of the implied covenant of good faith and fair dealing, a plaintiff "must allege 'sufficient facts which, if proven, would support an inference of bad faith.'" *Deleski Ins. Agency, Inc. v. Allstate Ins. Co.*, No. 13-cv-1780 (JRT/JJK), 2013 WL 6858573, at *11 (D. Minn. Dec. 30, 2013) (quoting *White Stone Partners, LP v. Piper Jaffray Cos.*, 978 F. Supp. 878, 885 (D. Minn. 1997)). "A party to a contract 'does not act in bad faith by asserting or enforcing its legal or contractual rights.'" *Sterling Capital Advisors, Inc. v. Herszog*, 575 N.W.2d 121, 125 (Minn. Ct. App. 1998) (quoting *Burgmeier v. Farm Credit Bank*, 499 N.W.2d 43, 50 (Minn. Ct. App. 1993)); *Residential Funding Co. v. Terrace Mortg. Co.*, 725 F.3d 910, 918 (8th Cir. 2013) (same). Bad faith can be found where the facts alleged show "an ulterior motive for [a party's] refusal to perform a contractual duty." *Minnwest Bank Cent. v. Flagship Props. LLC*, 689 N.W.2d 295, 303 (Minn. Ct. App. 2004).

### 1.  Duty to Commercialize[1]

GE moves to dismiss Count II of the Amended Complaint and argues that SSI has failed to allege a breach of the implied covenant of good faith and fair dealing because GE was under no obligation to use any efforts to commercialize SWIFT. GE contends that the plain language of the APA imposes no duty to commercialize SWIFT or use any specific level of efforts if it chose to commercialize SWIFT, so its decision not to do so was entirely proper. *See* Def.'s Suppl. Reply at 1-7, ECF No. 69.

### a.  SSI's Contractual Argument

SSI argues that GE in fact has a duty to commercialize the SWIFT technology. According to SSI, because GE has such a duty under the contract, it must exercise it according to the covenant of good faith and fair dealing. To support this argument, SSI relies upon language in the "Instrument of Assumption," which is part of the contract documents comprising the APA. *See* Pl.'s Suppl. Resp. at 4, ECF No. 66.

The Instrument of Assumption provides that it "shall be binding upon [GE], its successors and assigns and shall inure to the benefit of [SSI], its successors and assigns." APA at 170 (Instrument of Assumption). In addition, the Instrument of Assumption provides that GE "assumes and agrees to discharge in accordance with the terms thereof the Assumed Liabilities," APA at 170, which is a defined term in the APA, *see* APA ¶ 1.3. GE's "Assumed Liabilities" include SSI's obligations "to be paid or performed after the Closing Date under the Seller Agreements," APA ¶ 1.3(a),

---

[1]    In its initial briefing GE argued that with respect to any duty to commercialize imposed by the original license agreement, only the University of Minnesota would have "standing" to complain about a failure to commercialize, not SSI. Def.'s Mem. at 7-8, ECF No. 26. After SSI raised a new argument in response to this issue for the first time at the hearing and the Court ordered supplemental briefing on the issue, *see* ECF No. 56, the parties fleshed out their positions on the issue in supplemental memoranda. Pl.'s Suppl. Resp., ECF No. 66; Def.'s Suppl. Reply, ECF No. 69. This argument now focuses on whether a contractual duty to commercialize exists, rather any doctrine of standing.

which includes the License Agreement, *see* APA ¶ 1.1(d); *id.* at 89 ¶ 4. There is no dispute that SSI took on the obligation to use commercially reasonable efforts to commercialize SWIFT technology when it entered the License Agreement with the University of Minnesota. SSI argues that: (1) SSI was contractually obligated by the License Agreement to use commercially reasonable efforts to commercialize SWIFT technology; (2) GE assumed SSI's obligations of the License Agreement as part of the "Assumed Liabilities" under the APA;[2] and (3) that assumed obligation inures to SSI's benefit by the terms of the Instrument of Assumption. SSI asserts that GE, therefore took on the obligation to use commercially reasonable efforts to commercialize SWIFT when it executed the APA. According to SSI, GE breached the covenant of good faith and fair dealing when it allegedly acted in bad faith by failing to use commercially reasonable efforts to commercialize the SWIFT technology. *See* Pl.'s Suppl. Mem. at 5-8.

### b. Analysis

The Court is not persuaded by SSI's argument. Specifically, the Court concludes that GE had no contractual duty to commercialize SWIFT technology that would be subject to the covenant of good faith and fair dealing. Adopting SSI's reading of the contractual provisions on which it relies would nullify the clear, precise, and specific language the parties used in Paragraph 2.2(a)(iv)(D) of the APA. Stated differently, there is no way to reasonably understand the parties' contract that leaves room for SSI's interpretation without rendering Paragraph 2.2(a)(iv)(D) meaningless. *See Chergosky v. Crosstown Bell, Inc.*, 463 N.W.2d 522, 526 (Minn. 1990) (providing that courts must "attempt to avoid an interpretation of the contract that would render a provision meaningless").

---

[2]    Although SSI asserts that GE concedes that GE has the obligation to use commercially reasonable efforts to commercialize SWIFT technology pursuant to the PLA, *see* Pl.'s Suppl. Resp. at 3-4, the Court finds that GE has not conceded this point.

Paragraph 2.2(a)(iv)(D) explicitly provides that GE "shall have no obligation to pursue the commercialization of [SWIFT technology] or use any specific level of efforts if [GE] chooses to commercialize any [SWIFT technology]." APA ¶ 2.2(a)(iv)(D). This language plainly and unambiguously disclaims that GE must use any specific level of efforts to commercialize MRI scanners using SWIFT. But it goes even further, providing that GE has no obligation to commercialize MRI scanners at all. The language of a contract must be read as a whole and in a manner that gives meaning to all of its provisions, *Brookfield Trade Ctr., Inc. v. County of Ramsey*, 584 N.W.2d 390, 394 (Minn. 1998), and the Court cannot give any effect to Paragraph 2.2(a)(iv)(D) if it adopts SSI's reading.

SSI's strained interpretation would also undermine other provisions in the APA. For example, GE's assumed obligations are expressly limited by the definition of "Excluded Liabilities" in the APA. APA ¶ 1.4; *see also* APA at 170. Pursuant to that definition, GE did not take on "any liabilities or obligations owed to the U of M pursuant to any Seller Agreement that arose or were incurred prior to the Closing Date and all other liabilities or obligations owed to the U of M. . . ." APA ¶ 1.4(k). SSI also represented in the APA that it had already fulfilled and performed its obligations under the U of M License (including . . . the achievement of all commercialization obligations and milestones set forth therein in accordance therewith. . . .)" APA ¶ 4.14(b). Read together with the language in Paragraph 2.2(a)(iv)(D), these provisions indicate the parties intended GE to purchase SSI's rights to SWIFT technology, but not to owe any specific obligation with respect to future commercialization other than a commitment to put the technology through GE's ATD Program. SSI does not attempt to square the language of these two provisions of APA with its proposed interpretation.

The Court's rejection of SSI's reading of the contract is further supported by the manner in which the Instrument of Assumption deals with the interplay between its terms and those of the APA. The Instrument of Assumption "is not intended to enlarge, limit or alter the rights or obligation so [SSI] or [GE] under the [APA]." APA

at 170. But SSI's proposed interpretation does precisely that, imposing an obligation where Paragraph 2.2(a)(iv)(D) says that none exists. And to the extent there is a conflict between the APA and the Instrument of Assumption, the latter provides that the APA's term shall control. Specifically, the Instrument of Assumption states that "[i]n the event that any provision of this Instrument of Assumption conflicts with, or is inconsistent with, any provision of the [APA], the provisions of the [APA] shall control." APA at 170. SSI offers no reading that harmonizes its proposed interpretation of the Instrument of Assumption and Paragraph 2.2(a)(iv)(D) of the APA.

Careful analysis of the documents at issue reveals that SSI is trying to leverage the implied covenant of good faith and fair dealing to create an obligation for GE that is not a part of the APA. However, the covenant "serves only to enforce existing contractual duties, and not to create new ones." *Watkins Inc. v. Chilkoot Distrib., Inc.*, 719 F.3d 987, 994 (8th Cir. 2013). The *Watkins* decision illustrates why SSI's claim fails. Watkins, a household products manufacturer, entered agreements with distributors to market their products in Canada and to recruit new sales associates, establishing the distributors' "downline," which would affect the commissions the distributors could earn under the agreements. *Id.* at 989-90. The distributors' "downline" included a Canadian mass-market retailer, and the distributors' commissions from the retailers' sales decreased Watkins' share. As a result, Watkins restructured the arrangement and removed the Canadian mass-market retailer from the distributors' downline. This reduced the distributors' commissions and increased Watkins' share. *Id.* at 990-91. During litigation, the distributors claimed that Watkins had breached the implied covenant of good faith and fair dealing by removing the retailer from their downline. *Id.* at 991, 993-94. The district court granted Watkins' motion for summary judgment, and on appeal the Eighth Circuit agreed.

> Watkins had no duty under either agreement to guarantee the permanence of downline associates and no duty to maintain a downline associate's initial classification as a sales associate. Such burdens were simply not present in the agreements, and apparently were not bargained

> for by [the distributors]. If Watkins had no duty under the agreements to
> preserve [the distributors'] downline at all, we may not create a new
> obligation for Watkins to protect [the distributors'] downline in good
> faith.

*Id.* at 994. Here, the same is true. If, as the Court concluded above, the APA and
Instrument of Assumption impose no duty on GE to use commercially reasonable
efforts to commercialize SWIFT technology, the Court cannot create a new obligation
for GE to use such commercially reasonable efforts in good faith.

In support of its argument, SSI relies upon *Stuart v. Stuart*, No. A12–1044, 2013
WL 490825 (Minn. Ct. App. Feb. 11, 2013). However, *Stuart* does nothing to bolster
SSI's argument that GE owes an obligation to use commercially reasonable efforts to
commercialize SWIFT technology. *Stuart* involved an intra-family dispute regarding a
parcel of lakefront property. The plaintiff claimed he had a right of first refusal on a
sale of the parcel, which he allegedly acquired when his father transferred property
rights to the parcel through a warranty deed from his father. His father's contract with
the plaintiff's grandparents (where the right of first refusal was created) provided that
it would inure to the benefit of the contracting parties' successors and assigns. The
Minnesota Court of Appeals found that the "inure to the benefit" contract language
was plain and unambiguous and passed the right of first refusal to plaintiff. *See id.* at
*5-6. The similarities between that case and this one end with the fact that *Stuart*
involves "inure to the benefit" language comparable to the language found in the
Instrument of Assumption. Here, unlike in *Stuart*, SSI attempts to rely on "inure to
the benefit" language in the Instrument of Assumption to create an obligation for GE
that the APA expressly disclaims.

For these reasons, the Court concludes that SSI has failed to state a claim for
breach of the implied covenant of good faith and fair dealing based on the assertion
that the APA imposes an obligation on GE to use commercially reasonable efforts to
commercialize SWIFT technology and GE failed to do so in good faith.

### 2.  The NPI Program and Allegations of Bad Faith

The other component of SSI's implied covenant of good faith and fair dealing claim asserts that GE acted in bad faith when it exercised its discretion not to develop an NPI Program. The APA gives GE the right to decide whether to develop an NPI program and leaves that decision up to GE's sole discretion. Specifically, the APA provides that: "if, following the completion of the ATD Program, [GE] determines *in its sole discretion* that an NPI Program is appropriate for any product using the SWIFT Technology, [GE] shall create, in accordance with its standard policies and procedures, an NPI Program with respect to such product."  APA ¶ 2.2(a)(iv)(D).

Here, resolution of GE's motion to dismiss really comes down to whether GE's alleged subjective motivation constitutes bad faith. GE argues that the APA's grant of discretion in determining whether to develop an NPI Program entitled GE to make a business judgment, which includes consideration of the royalties GE would owe to SSI if it eventually commercialized MRI scanners incorporating SWIFT technology. *See* Def.'s Mem. at 8-11. SSI asserts that GE favored its own MRI technology (SilentScan) over the SWIFT technology to avoid commercializing SWIFT products that would, in turn, require those royalty payments to SSI. Because GE allegedly elevated its own financial interests in its exercise of discretion, SSI asserts that GE had an impermissible "ulterior motive" that deprived SSI of substantial revenue. Pl.'s Resp. at 6-8. Again, the Court finds SSI's argument unpersuasive

In their briefing, both GE and SSI focus heavily on the decision in *BP Prods. N. Am., Inc. v. Twin Cities Stores, Inc.*, 534 F. Supp. 2d 959 (D. Minn. 2007). In *BP Products*, the court considered a gasoline distributor's motion for summary judgment on a counterclaim for breach of the implied covenant asserted by an owner and operator of several gas stations and convenience stores. The parties' agreement gave the distributor the right, "in [its] sole discretion," to set retail prices for gasoline at the owner's stores, and for a time, the distributor set its gasoline prices two cents higher than competitors in a failed attempt to capture additional revenue. *Id.* at 960-62. The owner claimed that the distributor's pricing strategy breached the implied covenant of

good faith and fair dealing and the court granted the distributor's motion for summary judgment. *Id.* at 965-68 (addressing the claim). The court's decision plainly rejected the owner's position that the covenant could be breached based on a showing that the pricing strategy was "objectively unreasonable." *Id.* The court explained that when a contract gives sole discretion to one party "to control some aspect of the parties' relationship[, t]he implied covenant of good faith and fair dealing prevents the party with control from abusing its discretion in a manner that would inflict harm on the vulnerable party and undermine the purpose of the contract." *Id.* at 965. This means that a party claiming a breach of the covenant based on such an abuse of discretion must show that that the party exercising its discretion made decisions "dishonestly, maliciously, or otherwise in subjective bad faith." *Id.* at 968.

The decision in *BP Products* resolves one part of the issues before the Court in this case. To the extent that SSI argues that it has stated a claim because its Amended Complaint alleges facts showing that GE's exercise of its discretion to not establish an NPI Program was objectively unreasonable, *BP Products* holds than an "abuse of discretion" or even an unreasonable decision is not enough to establish a breach of the covenant. *See BP Prods.*, 534 F. Supp. 2d at 968 (concluding that a claim for breach of the covenant could not be sustained based on a showing that the party with sole discretion exercised that discretion unreasonably, but not "dishonestly, maliciously, or otherwise in subjective bad faith"). But as noted above, the parties' real disagreement here is whether GE's alleged subjective motivation to avoid royalty payments amounts to bad faith. Though *BP Products* does little to answer that question, other decisions provide an answer and undermine SSI's interpretation.

In particular, two cases are more instructive on the parties' dispute here: *Sterling Capital Advisors, Inc. v. Herzog*, 575 N.W.2d 121 (Minn. Ct. App. 1998); and *Yarborough v. DeVilbiss Air Power, Inc.*, 321 F.3d 728 (8th Cir. 2003). Following the reasoning of these cases, the Court concludes that GE's alleged subjective motivation to promote its own technology over SWIFT, even for the purpose of avoiding making royalty

payments to SSI, does not state a claim that GE breached the covenant of good faith and fair dealing by acting in bad faith.

In *Sterling Capital*, a holding company for a bank entered a retainer contract with Sterling whereby the latter agreed to find a buyer to acquire the holding company's business. Sterling would receive a fee and a percentage of proceeds of the sale if the purchase price was over $5.4 million. 575 N.W.2d at 123. The holding company's shareholders had the contractual right to exercise their "sole discretion" to accept or reject any offers to buy the business; they rejected all the offers received, including some that exceeded the $5.4 million threshold. The holding company advised Sterling the company was no longer for sale. *Id.* Sterling sued, claiming that the holding company had breached the implied covenant of good faith and fair dealing, and the district court granted the defendant's motion for summary judgment. *Id.* at 124. The Minnesota Court of Appeals affirmed, rejecting Sterling's attempt "to restrict the shareholders' unlimited discretion in the contract . . . by imposing the implied covenant of good faith and fair dealing onto the right to reject clause." *Id.* at 125. The "shareholders were exercising a contract right when they rejected the offers and decided to wait to sell . . . ." *Id.* (noting that "[a] party to a contract does not act in bad faith by asserting or enforcing its legal and contractual rights") (internal quotation marks omitted). In part, the court reasoned that the shareholders considered the offers, but believed the bids were too low. *Id.* The court also rejected Sterling's argument that the shareholders acted in bad faith because the contract set a threshold price of $5.4 million, and the shareholders rejected bids over that amount, which would have required it to make a percentage payment to Sterling Capital. *Id.*

Similarly, in *Yarborough*, 321 F.3d at 733, the Eighth Circuit considered an implied covenant claim alleging that a contracting party abused its discretionary power.[3] There, Yarborough and Williamson sold their business to DeVilbiss Air

---

[3]     The court applied Arkansas law in *Yarborough*, which also implies a covenant of good faith and fair dealing into every contract. However, the reasoning in *Yarborough* is

*(footnote continued on next page)*

Power, Inc. The contract provided that, once a threshold dollar amount in sales was reached, Yarborough and Williamson would receive a percentage of sales through "earn out" payments. *Id.* at 730-31. DeVilbiss had the sole discretion to decide whether to make any sales at all under the contract. Wal-Mart was one of the major customers that could earn Yarborough and Williamson their so-called earn-out payments. DeVilbiss made a decision to stop making sales to Wal-Mart and substitute Sears, but Sears was a customer for which Yarborough and Williamson would not receive earn-out payments. *Id.* at 732. In their lawsuit, Yarborough and Williamson alleged that DeVilbiss' decision to swap out Sears for Wal-Mart violated the implied covenant of good faith and fair dealing. They claimed that "the only reason for discontinuing sales to Wal-Mart was to decrease the amount of the earn-out payment in order to increase the bonus paid to company officers. . . ." *Id.* The Eight Circuit found that because the contract gave DeVilbiss the "absolute right" to decide whether to make any sales that would generate payments to Yarborough and Williamson, "it would contravene the parties' intentions to imply a covenant that creates the obligation that the plaintiffs argue for." *Id.* at 732-33. Further, the court stated:

> [W]e believe that in no situation can the implied covenant of good faith and fair dealing limit the way in which a party exercises its discretion when the aggrieved party has specifically disavowed any limitations on that discretion, and the exercise of that discretion (and its consequences) are easily foreseeable.

*Id.* at 733. The court also concluded that DeVilbiss "deserve[d] the benefit of its bargain" because it had "expressly and unambiguously contracted for absolute power over its ability to make sales in order, we think, to foreclose exactly the kind of claim that the plaintiffs press in this case." *Id.*

---

(*footnote continued from previous page*)
consistent with that applied by the Minnesota Court of Appeals in *Sterling Capital*, so it is persuasive on the question before the Court.

16

Like the parties in *Sterling Capital* and *Yarborough*, SSI and GE expressly and unambiguously agreed that GE would have a unilateral contractual right to decide whether to create an NPI Program for SWIFT technology. Had SSI wanted to limit GE's exercise of discretion to prohibit it from acting in a self-serving way, it could have negotiated language that would have imposed such a constraint. It did not, and as a result, even accepting as true that GE decided not to start an NPI Program out of pure economic self-interest and to avoid making royalty payments to SSI, GE was simply asserting or enforcing its legal and contractual rights. Like DeVilbiss in *Yarborough* and the shareholders in *Sterling Capital*, GE deserves the benefit of its bargain.

SSI argues "that perceived economic benefits—such as GE's avoidance of making royalty payments to SSI—can constitute an 'ulterior motive' sufficient to plead bad faith, and therefore a breach of the implied covenant." Pl.'s Suppl. Mem. at 8. Though SSI cites *BP Products* for this proposition, SSI really relies on *White Stone*, the case *BP Products* was addressing in the passage SSI cites. *See id.* (citing *BP Prods.*, 534 F. Supp. 2d at 966 (discussing *White Stone partners, LP v. Piper Jaffray Cos.*, 978 F. Supp. 878, 880 (D. Minn. 1997))). The Court finds SSI's argument here unpersuasive for two reasons. First, as explored above, the rationale for the decisions in both *Sterling Capital* and *Yarborough* runs directly contrary to SSI's suggestion that a plaintiff states a claim for breach of the implied covenant of good faith and fair dealing where it alleges that the defendant exercised a right of sole discretion with the subjective motivation of achieving for itself "perceived economic benefits."

Second, *White Stone*'s holding is much narrower than SSI suggests. It does not hold that a party acts with an impermissible ulterior motive or subjective bad faith whenever it exercises its unilateral control over an aspect of the parties' agreement for economically self-interested reasons. In that case, White Stone Partners wanted a loan from Piper Jaffray to buy a trailer park, and in the parties' contract, Piper agreed to provide $1 million in financing subject to an acceptable appraisal and environmental study. 978 F. Supp. at 879-80. The contract gave Piper sole discretion to determine

whether the appraisal and environmental study were acceptable. White Stone's two surveys showed no problems with the site, but Piper rejected them and canceled the agreement to provide financing. *Id.* at 880. Under these circumstances, though the Minnesota Supreme Court had not addressed the precise issue, the court concluded that "the Minnesota Supreme Court would require a party to exercise good faith in exercising an unlimited discretionary power over a term in the contract *if necessary to effectuate the parties' intent and to save a contract from being held to be illusory.*" *Id.* at 882 (emphasis supplied). *White Stone* has since been distinguished on precisely this basis: "In *White Stone*, there appears to have been real potential for an illusory contract. If [Piper] could terminate the contract due to uncontrolled dissatisfaction, it may not have committed to anything in the [parties' agreement]." *RBC Dain Rauscher, Inc. v. Fed. Ins. Co.*, No. 03-cv-2609 (DSD/SRN), 2003 WL 25836278, at *10 (D. Minn. Dec. 2, 2003).[4] There is no comparable risk here that the APA would be an illusory contract even without the NPI provision, and SSI does not suggest that it would. SSI received a substantial payment in exchange for its transfer of exclusive SWIFT licensing rights to GE. GE also committed to put the SWIFT technology through its own research and development process (ATD Program), notwithstanding its lack of an obligation in the APA to commercialize SWIFT.

In sum, the Court concludes that SSI has also failed to state a claim for breach of the implied covenant of good faith and fair dealing based on the assertion that GE decided not to create an NPI Program because it had a subjective desire to avoid making royalty payments to SSI.

### 3. Further Leave to Amend

SSI argues that if the Court finds the allegations in the Amended Complaint insufficient, it should allow SSI an opportunity to further amend its pleading to set

---

[4]     The report and recommendation in *RBC Dain Rauscher* was adopted by the District Court and the implied covenant of good faith and fair dealing claim dismissed with prejudice. Civil No. 03-2609, ECF No. 34 (Dec. 18, 2003) (Order).

forth its breach of the implied covenant of good faith and fair dealing claim. Pl.'s Resp. at 16-17. SSI asserts that any deficiencies in its Amended Complaint "are curable by amendment." *Id.* at 16. With respect to the breach of implied covenant of good faith and fair dealing claim, the Court concludes that dismissal should be with prejudice under the circumstances here. The deficiency identified with the implied covenant claim in Count II is not the type of deficiency amenable to being cured with repleading. *See Tate v. Scheidt*, No. 15-cv-3115 (WMW/JSM), 2016 WL 7155806, at *9 n.8 (D. Minn. Oct. 7, 2016) (Mayeron, M.J.) ("When a complaint is so deficient or defective that the court is convinced that its defects cannot be cured through re-pleading, dismissal with prejudice is appropriate."), *R&R adopted by*, 2016 WL 7175593 (D. Minn. Dec. 7, 2016).

Through repleading, SSI cannot change the reality that the plain language of the contract embodies no responsibility on GE's part to use commercially reasonable efforts to commercialize SWIFT technology. Whatever additional facts SSI may have at the ready concerning this portion of the claim in Count II, SSI would still be attempting to use the implied covenant of good faith and fair dealing to create a new contractual duty rather than to inform an existing one. Nor can SSI change the fact that GE was given sole discretion to determine whether to create an NPI Program, discretion it could exercise for self-serving economic reasons. Because the Court finds it unlikely that SSI could cure the legal insufficiency of its implied covenant of good faith and fair dealing claim, Count II should be dismissed with prejudice.

### B. Counts III and IV

As discussed above, SSI has alleged that after the APA was formed, GE's agents made repeated promises to SSI that it would, in fact, commercialize SWIFT technology, and in exchange, SSI agreed to make additional investments in that commercialization effort. *See* discussion, *supra*, at p. 4. SSI asserts that this exchange created an oral contract obligating GE to commercialize SWIFT technology. Am. Compl., Count III. In the alternative SSI maintains that these facts support a claim for promissory estoppel. *Id.*, Count IV. GE argues that SSI's post-APA contract claim

should be dismissed for two related reasons. GE contends that the contract claim is implausible because the APA's terms directly contradict the alleged post-formation promises. GE also contends that the claim fails because the APA prohibits any modification of its terms by oral agreement. *See* Def.'s Mem. at 11-14. GE further argues SSI's allegations fail plausibly to establish the elements of a promissory estoppel claim. *Id.* at 15-17. The Court concludes that SSI has adequately pled its claims in Counts III and IV of the Amended Complaint.[5]

### 1. The Post-APA Contract Claim

The APA included a provision stating that: "This Agreement shall not be amended, modified or supplemented except by a written instrument signed by an authorized representative of each of the parties hereto." APA ¶ 8.7. However, despite this seemingly crystalline language, Minnesota jurisprudence concerning the effect of such provisions holds that such no-oral-modification clauses do not foreclose claims based on subsequent oral agreements. *See Larson v. Hill's Heating & Refrigeration of Bemidji, Inc.*, 400 N.W.2d 777, 781 (Minn. Ct. App. 1987) ("The general common law rule is that a written contract can be varied or rescinded by oral agreement of the parties, even if the contract provides that it shall not be orally varied or rescinded."); *Mogren v. Johnson*, A15-1568, 2016 WL 3884503, at *5 (Minn. Ct. App. July 18, 2016) (same, citing *Larson*); *Routson Invs., Inc. v. Andrews Props., LLC*, No. A13-2232, 2014 WL 3558359, at *1 (Minn. Ct. App. July 21, 2014) (same); *Metro Paving, Inc. v. Luedeman*, No. A05-776, 2006 WL 1320603, at *5 (Minn. Ct. App. May 16, 2006) (same). The presence of the no-oral-modification clause in the APA, therefore, does not require dismissal of Count III as a matter of law.

Nevertheless, GE argues that in light of the clause requiring modification of the contract to be in writing, the absence of a signed, written agreement

---

[5]     Because the Court concludes that Counts III and IV are sufficiently pled, it does not address whether SSI should be given another opportunity to plead these claims.

memorializing GE's alleged post-APA promises to commercialize renders SSI's allegations implausible. *See* Def.'s Mem. at 12 ("The lack of a signed, written agreement reflecting this purported post-APA contract renders it both implausible and foreclosed by the unambiguous language of the APA.").[6] GE also argues that it is "particularly unlikely" that GE made post-APA promises to commercialize SWIFT after it expressly disavowed such an obligation in the APA and retained the sole power to make the decision whether to commercialize the technology. *See* Suppl. Letter at 1 (citing *Riley v. Vilsack*, 665 F. Supp. 2d 994, 1003 (W.D. Wis. 2009)). Though GE's argument has a clear ring of common sense, the standards applicable under Rule 12(b)(6) to a motion to dismiss for failure to state a claim do not allow for consideration of whether a plaintiff's allegation that a defendant made a promise to it are more or less likely. A determination that the allegations of post-APA promises are "particularly unlikely" would be no different than making a credibility ruling concerning the allegations in a pleading. This the Court cannot do. Accordingly, the Court concludes that Count III ought not be dismissed based on GE's suggestion that the allegations of oral promises made after formation of the APA are unlikely to be true.

Finally, GE argues that SSI failed to plead sufficient facts to plausibly allege that an agreement was reached because the terms of the alleged post-APA oral agreement are not specified. *See* Def.'s Mem. at 13-14; Def.'s Suppl. Letter at 2-3. GE contends that SSI's claim is implausible because SSI has not alleged:

> how or in what medium the SWIFT Technology would be commercialized . . ., what timeframe the parties agreed to, that the purported statements in September 2014 constituted a bona fide offer that was accepted, or that [GE's personnel who allegedly made the

---

[6]     The Court solicited (and the parties filed) supplemental post-hearing briefing addressing this plausibility issue. Def.'s Suppl. Letter, ECF No. 58; Pl.'s Suppl. Letter, ECF No. 61. The Court has considered the parties' arguments in these letters in reaching its proposed conclusions in this report and recommendation.

promises] had authority to bind GE if these statements were indeed an offer.

Def.'s Mem. at 14.

Certainly SSI's allegations concerning the post-APA agreement are not "as specific as they could be," *Chambers v. Travelers Companies, Inc.*, No. 08-cv-5947 (JMR/JJK), 2009 WL 873124, at *5 (D. Minn. Mar. 30, 2009) (Order adopting R&R), but this does not mean that SSI has failed to state a claim for breach of contract. SSI has alleged that a contract was formed when SSI exchanged additional investments in the efforts to commercialize SWIFT for GE's commitment to commercialize the technology. It also claims that GE did not keep its promise to commercialize the SWIFT technology, causing harm to SSI. Accepting these facts as true, the Amended Complaint contains sufficient factual allegations to show formation of a contract (including an exchange of consideration), performance by SSI, a breach by GE, and damages. *See id.* (citing *Parkhill v. Minn. Mut. Life Ins. Co.*, 174 F. Supp. 2d 951, 961 (D. Minn. 2000), and listing elements of a breach of contract claim). Accordingly, the Court concludes that the breach of contract claim in Count III of the Amended Complaint is sufficiently pled.

## 2.  The Promissory Estoppel Claim

SSI's promissory estoppel claim in Count IV of the Amended Complaint is premised on the same facts as its breach of contract claim in Count III. "To state a claim for promissory estoppel, the plaintiff must show that (1) there was a clear and definite promise, (2) the promisor intended to induce reliance and such reliance occurred, and (3) the promise must be enforced to prevent injustice." P*ark Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 834 (Minn. 2011).

GE first argues that the promissory estoppel claim should be dismissed because such a claim may only be made where no contract exists. Def.'s Mem. at 15. The Court finds this argument unpersuasive because "a [p]laintiff may validly assert both a breach of contract claim and a promissory estoppel claim in the alternative." *Transport Drivers, Inc. v. Coca-Cola Refreshments USA, Inc.*, No. 16-cv-1074 (DWF/BRT), 2017 WL

1954772, at *13 (D. Minn. May 10, 2017). The Court construes the Amended
Complaint to present just such an alternative pleading. If a second contract was
formed, as claimed in Count III, then no promissory estoppel claim exists. However,
if no post-APA contract was formed, then SSI asserts that it was induced to rely on
GE's promise to commercialize SWIFT to its detriment.

GE also contends that SSI's allegation that "GE intended to induce SSI to rely
on its promises" is a conclusory allegation that is not entitled to the assumption of
truth. Def.'s Mem. at 17 (citing *Iqbal*, 556 U.S. at 679). Even though this claim
standing alone lacks robust articulation, the Amended Complaint contains enough
factual content to show that GE intended SSI to rely on alleged post-APA promises
to commercialize SWIFT. Taking all reasonable inferences in SSI's favor, the Court
can easily infer that the GE's representatives had reason to know that SSI would rely
to its detriment on GE's alleged post-APA promises of commercialization.

GE next argues that SSI's promissory estoppel claim lacks sufficient "factual
content to draw a reasonable inference that GE made a clear and definite promise, as
is required to prove a claim of promissory estoppel." Def.'s Mem. at 17. For the same
reasons the Court rejected GE's similar arguments in the context of Count III, the
Court rejects this argument as well. SSI has alleged that GE clearly and definitely
promised to commercialize SWIFT. GE is not "left to guess what exactly the
purported promise to SSI was," and it cites no support for its implicit assertion that
failure to allege a "timeline" for completion of that commercialization is fatal to SSI's
promissory estoppel claim. *See id.* The Amended Complaint tells us who made the
promise that GE would commercialize the SWIFT technology and when that promise
was made to SSI's representative.

Finally, GE argues that it is implausible to believe that GE made such a
promise to commercialize SWIFT because the APA requires amendments,
modifications, or supplements to the parties' agreement to be made by a signed,
written agreement. Def.'s Mem. at 17-18. However, GE has not provided any case law
to support this plausibility argument. Moreover, like GE's similar argument

concerning Count III, finding these allegations insufficient would require the Court to reject them as unbelievable, which is not allowed under Rule 12(b)(6).

In sum, given the lens through which the Court must assess GE's motion and SSI's claims at this stage, both Counts III and IV sufficiently state viable claims.

## Recommendation

Based on the foregoing, the Court makes the following recommendations:

1. GE's Renewed Partial Motion to Dismiss and to Stay Deadline for Answering the Amended Complaint, **ECF No. 24**, should be **GRANTED IN PART** and **DENIED IN PART**.

2. The motion should be granted as to the claim for breach of the implied covenant of good faith and fair dealing asserted in Count II of the Amended Complaint. Count II should be **DISMISSED WITH PREJUDICE** for failure to state a claim.

3. The motion should otherwise be **DENIED**.


Date: November 2, 2017                 *s/ Katherine Menendez*
                                       Katherine Menendez
                                       United States Magistrate Judge


## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.