## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Steady State Imaging, LLC,     Case No. 0:17-cv-01048-JRT-KMM

     Plaintiff,

v.            **ORDER**

 General Electric Company,

     Defendant.

Devan V. Padmanabhan, Lisa B. Ellingson, and Paul J. Robbennolt, Winthrop & Weinstine, PA, counsel for plaintiff

Marla Butler and Nicole S. Frank, Robins Kaplan LLP, counsel for defendant

This case is before the Court on two motions seeking sanctions for alleged untimely supplementation of answers to interrogatories. Steady State Imaging, LLC ("SSI") has filed a Motion to Exclude Evidence Not Disclosed in Response to Interrogatories. [ECF No. 132.] General Electric Company ("GE") has filed a Motion to Strike Portions of Plaintiff SSI's Second and Third Supplemental Answers to Interrogatory No. 1. [ECF No. 138.] For the reasons that follow, GE's motion is **GRANTED IN PART** and **DENIED IN PART** and SSI's motion is **DENIED**.

## I. General Background

This litigation arises from GE's purchase of the assets of SSI. SSI's primary business involved a silent MRI technology, referred to as SWIFT, which SSI licensed from the University of Minnesota. In April of 2011, GE and SSI entered an asset purchase agreement ("APA"), which transferred SSI's rights in the SWIFT technology to GE in exchange for a substantial sum of money and according to a number of carefully drafted contractual terms. In its May 19, 2017 Amended Complaint, SSI

alleged that GE breached certain provisions of the APA. Specifically, in the APA, GE promised to put the SWIFT technology through a research and development program, known as an "ATD" program, but SSI asserts that GE did not actually do so. [Am. Compl. ¶ 45 & Count 1, ECF No. 22.]

After the APA was executed, SSI alleges that GE made "repeated" promises to SSI that GE would commercialize SWIFT. SSI described one example of such a post-APA promise in its Amended Complaint. It alleged that in September of 2014, GE employees Jason Polzin and Baldev Ahluwalia promised Danny Cunagin of SSI that GE would commercialize the SWIFT Technology. [Am. Compl. ¶ 37.] SSI also claims that it made additional investments to assist GE's commercialization efforts and refrained from suing to enforce the APA or from reacquiring the rights to SWIFT in exchange for GE's post-APA promises. According to SSI, this exchange formed one or more post-APA agreements, which GE breached by ultimately failing to commercialize SWIFT. [Am. Compl., Count III.] Alternatively, SSI contends that even if no enforceable post-APA contract was formed, GE is liable under the equitable theory of promissory estoppel. [Am. Compl., Count IV.] Of particular importance here, SSI's reference to "repeated" post-APA promises in the Amended Complaint made it clear that SSI based its post-APA claims on additional promises that were not identified in the amended pleading.

GE denies that it breached the APA and asserts that it fulfilled all of its obligations under that contact. GE asserts that it conducted an ATD program to evaluate SWIFT as the APA required, but it determined that SWIFT was not appropriate for inclusion in a subsequent marketing program for clinical and other reasons. With respect to the post-APA contract claim, GE asserts that no post-APA agreement exists. It claims that any post-APA agreement would be barred by the APA's explicit integration clause and precluded by a provision requiring any modifications, amendments, or future agreements to be in writing. In addition, GE denies that it ever made any post-APA promise to commercialize SWIFT.

On June 2, 2017, GE brought an early partial motion to dismiss the Amended Complaint that was aimed, in part, at SSI's claims that GE breached a post-APA agreement or was liable under a promissory estoppel theory. GE argued that: SSI had failed to provide sufficient detail about any alleged post-APA promises to sustain a claim under either theory; SSI could not demonstrate that any GE employee had the authority to bind GE to any post-APA promise; and SSI's claims concerning post-APA agreements were barred because they were not in writing. [ECF Nos. 24, 26.]

The parties conducted a Rule 26(f) meeting on June 9, 2017. They agreed that fact discovery would be concluded on February 16, 2018, a deadline which the Court adopted in a Scheduling Order. [Rule 26(f) Report at 3, ECF No. 32; Scheduling Order (June 28, 2017) at 1 ¶ 3, ECF No. 38.] Shortly after the Scheduling Order was issued, the parties served the following discovery relevant to the current dispute: (1) GE served an interrogatory asking SSI to provide detailed factual information about each of the promises that formed the basis of SSI's post-APA contract and promissory estoppel claims; and (2) SSI served contention interrogatories asking GE to identify the factual basis for GE's assertion that it is not liable for breach of the APA or any post-APA promise, and interrogatories asking for information about GE's ATD programs.

On August 29, 2017, the Court concluded that Rule 12(a)(4) extended the time for GE to serve an Answer to the Amended Complaint such that no responsive pleading would be due until fourteen days after the District Court ruled on the motion to dismiss. [Order (Aug. 29, 2017), ECF No. 55.] On November 2, 2017, this Court recommended that GE's motion to dismiss be granted in part and denied in part. In particular, the Court concluded that despite a lack of clarity regarding SSI's post-APA contract and promissory estoppel claims, SSI had done enough to survive Rule 12(b)(6) dismissal. [ECF No. 85 at 19–24.] The District Court adopted the report and recommendation and GE served its Answer to the Amended Complaint on January 31, 2018. [Ans., ECF No. 122.]

In the motions now before the Court, each side seeks exclusion of certain evidence because the other party supplemented its answers to the interrogatories at issue at the end of the fact-discovery period. GE's motion concerns SSI's January 25, 2018 and February 16, 2018 supplemental answers to GE's interrogatory about post-APA promises. GE argues that these supplemental answers are untimely because SSI waited until the end of the discovery period to provide the information. SSI's motion challenges the timeliness of GE's disclosure of several affirmative defenses, which GE identified in its January 31, 2018 Answer, but had not previously included in its responses to SSI's contention interrogatories asking GE to describe the factual basis for its position that it was not liable for breach of the APA or a post-APA agreement. SSI also challenges GE's allegedly untimely supplementation of answers to interrogatories seeking information about GE's ATD programs.

## II.     Federal Rules of Civil Procedure 26(e) and 37(c)

Both SSI's and GE's motions seek sanctions pursuant to Rule 37(c) for violations of obligations to timely supplement interrogatory responses. If a party learns that its previous response to an interrogatory is materially incomplete or incorrect, it must supplement or correct that answer in a timely manner. Fed. R. Civ. P. 26(e)(1). But providing such supplementation is unnecessary where the additional or corrective information has "otherwise been made known to the other parties during the discovery process or in writing. . . ." *Id.*

To give teeth to Rule 26(e)'s supplementation requirement, the Federal Rules of Civil Procedure create a consequence for failure to timely supplement. If a party fails to provide information as required by Rule 26(e), that party may not use the undisclosed information "to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). In the face of a failure to supplement, a court can impose additional sanctions beyond exclusion or can fashion an alternative appropriate remedy. Fed. R. Civ. P. 37(c)(1)(A)–(C) (providing that the court can consider requiring payment of fees, informing the jury of the failure, or imposing other appropriate sanctions "in addition

to or instead of" exclusion); *see also Design Strategy, Inc. v. Davis*, 469 F.3d 284, 298 (2d Cir. 2006) ("Thus, the plain text of the rule provides that if an appropriate motion is made and a hearing has been held, the court does have discretion to impose other, less drastic sanctions.").

The Court has considerable discretion in fashioning an appropriate sanction for discovery violations under Rule 37(c)(1). *Wagener v. Johnson*, 527 F.3d 687, 692 (8th Cir. 2008). However, the more serious the sanction to be imposed, the more circumscribed that discretion becomes. *Id.* (explaining that "discretion narrows as the severity of the sanction or remedy [the district court] elects increases"). Because "the exclusion of evidence is a harsh penalty [that] should be used sparingly," *id.*, courts should consider whether lesser sanctions can create an appropriate remedy, *see Heartland Bank v. Heartland Home Finance, Inc.*, 335 F.3d 810, 817 (8th Cir. 2003). "Generally speaking, federal courts favor resolution of cases on their merits over the imposition of drastic, tactical sanctions." *Byrd v. J Rayl Transp., Inc.*, No. 13-cv-2279 (RHK/LIB), 2014 WL 12647772, at *2 (D. Minn. Oct. 3, 2014).

Courts deciding whether to preclude a party from using late-disclosed information or to impose some other sanction pursuant to Rule 37(c)(1) consider several factors, including: (1) how important the excluded material is to the case; (2) the proffered reason for the party's failure to provide the information in a timely fashion or any evidence of bad faith or willfulness; (3) the potential that the other party will be prejudiced if the information is not excluded; and (4) whether a continuance can be provided to cure any prejudice. *Transclean Corp. v. Bridgewood Servs., Inc.*, 77 F. Supp. 2d 1045, 1063 (D. Minn. 1999), *aff'd in part, vacated in part*, 290 F.3d 1364 (Fed. Cir. 2002) (citing *Citizens Bank v. Ford Motor Co.*, 16 F.3d 965, 966 (8th Cir. 1994); *Millen v. Mayo Foundation*, 170 F.R.D. 462, 465 (1996); *Trilogy Communications, Inc. v. Times Fiber Communications, Inc.*, 109 F.3d 739, 744 (Fed. Cir. 1997)).

## III.   GE's Motion

GE's motion seeks to preclude SSI from being able to offer certain evidence in support of its post-APA contract and promissory estoppel claims. [ECF No. 138.] For

the reasons that follow, the Court concludes that SSI's January 25, 2018 and February 16, 2018 supplemental responses to Interrogatory No. 1 were not timely. The Court also finds the late supplementation of these responses was not substantially justified, nor was it entirely harmless. However, the Court concludes that the remedy of exclusion is not warranted because any prejudice GE suffered as a result of the late supplementation can be remedied through a continuance to allow GE some additional limited discovery.

## A.    GE's Efforts to Discover the Alleged "Promises"

A confounding aspect of this case has been SSI's entrenched unwillingness to identify precisely what its post-APA breach of contract and promissory estoppel claims are about. SSI's Amended Complaint alluded to "repeated" post-APA promises by GE personnel to commercialize SWIFT, promises that either formed a new contract or contracts or that gave rise to promissory estoppel. But the Amended Complaint itself only provided limited information about one: the only post-APA promise identified in SSI's pleading was allegedly made by GE employees Jason Polzin and Baldev Ahluwalia to Danny Cunagin of SSI in September 2014. Unfortunately, despite repeated efforts on the part of GE to learn additional information regarding this critical aspect of SSI's case, only in the last month of discovery did SSI actually reveal several essential components of its post-APA claims.

### GE's Interrogatory No. 1

On July 13, 2017, GE served SSI with its First Set of Interrogatories. GE's Interrogatory No. 1 asks SSI to provide information about all of the promises that form the basis of its post-APA contract and promissory estoppel claims. GE's Interrogatory No. 1 reads:

> Identify and describe every "promise" or "representation" that SSI alleges GE made, after execution of the APA, to commercialize SWIFT as alleged in Paragraphs 36, 37, 53 and 59 of the Amended Complaint, including, but not limited to providing for each "promise": the date of the alleged promise; each person who was aware of, made, or received

the alleged promise; a description of each identified person's knowledge related to the alleged promise; the obligations of each party in relation to the alleged promise; the date(s) by which each party was required to satisfy its obligations in relation to the alleged promise; the details of any consideration offered and/or provided by SSI in relation to the alleged promise, including the details of any "investments" made by SSI as alleged in Paragraphs 38 and 54 of the Amended Complaint; the date(s) by which SSI satisfied any of its obligations in relation to the promise; and any documents that evidence the existence or substance of the alleged promise.

[ECF No. 141-1.] This is just the kind of "who, what, when and where" interrogatory that a defendant should ask and a plaintiff should answer early on in a case when a plaintiff contends that the defendant breached an oral contract.

### SSI's Initial Response and the Parties' Disagreements

SSI responded to GE's Interrogatory No. 1 on August 14, 2017. SSI had filed its Amended Complaint nearly three months earlier, so plenty of time had passed for SSI to get its ducks in a row. In its original response to the interrogatory, SSI again identified the alleged September 2014 promise to commercialize SWIFT made by Mr. Polzin and Mr. Ahluwalia to Mr. Cunagin. SSI's original answer identified an additional post-APA promise as well. SSI added that in late November or early December of 2011, Jacques Coumans of GE promised Mr. Cunagin and Troy Kopischke (another SSI representative) at GE's RSNA booth that GE would commercialize SWIFT. Finally, SSI repeated the assertion from its Amended Complaint that SSI made investments to assist with SWIFT commercialization and refrained from taking action to enforce the APA or to reacquire rights to SWIFT. No other details were provided (such as the timing of performance or the specific obligations GE allegedly incurred as a result of any promise) and no other promises were identified.

On September 7, 2017, GE sent SSI a deficiency letter raising concerns about SSI's answer to GE's Interrogatory No. 1. GE complained that SSI had simply repeated what it included in its Amended Complaint about the September 2014

promise and added one additional promise by Mr. Coumans, but had not provided the detailed information called for by the interrogatory. [ECF No. 141-3.] On September 12, 2017, SSI responded that it was continuing to investigate and intended to supplement its answer to Interrogatory No. 1 as additional information was discovered. [ECF No. 141-4.]

On October 4, 2017, GE again told SSI that its response to GE's Interrogatory No. 1 was deficient. GE stated: "GE is entitled to discover what facts, if any, SSI has that support its claim for breach of contract, including the consideration SSI alleges it gave in exchange for GE's alleged promises." [ECF No. 141-5.] On October 9, 2017, SSI complained that GE's repeated demands for confirmation that SSI would supplement its discovery responses were unnecessary and unproductive. SSI again stated that it would supplement in a timely manner. [ECF No. 141-6.]

On October 24, 2017, GE demanded that SSI provide a date within the next two weeks when SSI would provide a supplemental response to GE's Interrogatory No. 1. GE articulated the reason it believed such supplementation was required:

> As GE noted in its Motion to Dismiss, SSI's Amended complaint is devoid of any factual basis upon which GE can ascertain either (a) the existence of the post-APA agreement, or (b) the terms of the alleged agreement. SSI's continued refusal to provide information concerning the existence and terms of that alleged agreement 6 months after filing its amended complaint is hindering GE's ability to defend against SSI's allegations.

[ECF No. 141-7.] In response, SSI stated that it intended to supplement its discovery responses by November 7, 2017, though it ultimately did so in December. [ECF No. 141-8; ECF No. 141-10.]

### *SSI's First Supplemental Responses to Interrogatory No. 1*

On December 11, 2017, almost seven months after filing its Amended Complaint, SSI provided its First Supplemental Answer to GE's Interrogatory No. 1.

In this first supplemental response, SSI disclosed one additional post-APA promise. It stated that:

> on or about April 20-26, 2013, outside the main conference hall at the ISMRM meeting in Salt Lake City, Mike Garwood of SSI expressed concern to Jacques Coumans of GE that GE would not commercialize SWIFT. Mr. Coumans put his arm around Mike Garwood and promised him that GE would commercialize SWIFT.

[ECF No. 141-12.] SSI also provided additional details about the September 2014 promise that Messrs. Polzin and Ahluwalia of GE allegedly made to Mr. Cunagin of SSI, including asking for SSI to help developing SWIFT using resources at Stanford University. SSI pointed to a Bates-labeled document, indicating that GE could discern from that document additional information sought by its interrogatory. [*Id.*] SSI further provided information about the alleged consideration exchanged for this April 2013 promise by Mr. Coumans. [*Id.*] Again, SSI identified no other promises or provided more details about previously alleged promises.

### SSI's Second Supplemental Response to Interrogatory No. 1

On January 25, 2018, just three weeks before the close of fact discovery, SSI served its Second Supplemental Answers to Interrogatory No. 1. It provided additional material details about the previously-disclosed promises and described what appear to be two entirely new promises. As with its earlier supplementation, the second supplemental answers were somewhat short on the specifics called for by GE's Interrogatory No. 1. SSI added that GE's promises to commercialize SWIFT "contemplated the development and introduction to the market of a SWIFT brain imaging, or neuro, application." [ECF No. 141-13 at 8.] That SSI considered this neuro application to be a part of the promises allegedly made by GE had not been previously disclosed.

In addition to Mr. Coumans' alleged promise to Mr. Cunagin and Mr. Kopischke in late November or early December of 2011 at the RSNA meeting (which SSI identified in its initial response to the interrogatory), SSI stated for the first time that at the same meeting, Mr. Cunagin and Mr. Kopischke met with GE's then CEO Michael Harsh. Mr. Harsh allegedly "represented that GE wanted to get to

market fast with the RUFIS product, but that it would then follow with the commercialization of SWIFT products." [ECF No. 141-13 at 8.]

With respect to the promise made by Mr. Polzin and Mr. Ahulwalia at the ISMRM meeting between April 20-26, 2013, SSI added some additional information. SSI stated that during the meeting, "Mr. Polzin and Mr. Ahluwalia gave excuses about GE's lack of progress with SWIFT commercialization. Mr. Polzin and Mr. Ahluwalia represented that although GE was prioritizing other things like PET MR over SWIFT, SSI should not worry, because GE would commercialize SWIFT as soon as practicable." [ECF No. 141-13 at 8–9.] SSI gave a little more information about what happened when Mr. Coumans allegedly made a promise at the same meeting: "Mr. Coumans greeted Mr. Kopischke and Mr. Cunagin by shaking their hands and assuring them that they were going to make a lot of money from SWIFT commercialization." [*Id.* at 9.]

SSI also identified new information about a conversation between Messrs. Polzin, Ahluwalia, Kopischke, and Cunagin that took place on May 17, 2013. On that day, while discussing commercializing SWIFT,

> Mr. Polzin and Mr. Ahluwalia represented that GE was very interested in moving SWIFT forward but they needed SSI's assistance with that commercialization. Specifically, Mr. Polzin and Mr. Ahluwalia asked for SSI's assistance with applications that leverage the SWIFT technology and with making SWIFT run on conventional MRI hardware. They also requested that SSI provide GE a list of minimum requirements to make SWIFT work. Mr. Ahluwalia also asked to meet with Mike Garwood to discuss SWIFT during his visit to the University of Minnesota on June 10, 2013.

[ECF No. 141-13 at 9.] SSI further stated that Mr. Kopischke provided GE the requested information about SWIFT "as well as a list of possible solutions for identified issues with SWIFT." [*Id.*]

### SSI's Third Supplemental Response to Interrogatory No. 1

On February 16, 2018, the last day of the discovery period in this case, SSI served its Third Supplemental Answers to GE's Interrogatory No. 1. For the first

time, SSI disclosed details of an August 29, 2014 meeting that it argues provides "context"[1] for the promise made on September 12, 2014, which SSI had originally disclosed in its first answer to the interrogatory. [SSI's Mem. in Opp'n to GE's Mot. at 22–23, ECF No. 146.] SSI stated that Messrs. Cunagin, Kopischke, and Garwood met with Messrs. Polzin and Ahluwalia in Wisconsin. The SSI team complained about the slow progress in commercializing SWIFT, and reminded GE's representatives that "GE had told SSI that it would commercialize SWIFT by implementing SWIFT on its clinical scanners in a 'Silent Brain' or neuro application, and that it could do so within a year." [ECF No. 141-14 at 10.] SSI's representatives stated that GE needed to reaffirm its agreement to commercialize SWIFT or SSI would take action to enforce the agreement to commercialize. [*Id.*] No previous answer or supplemental answer to the interrogatory had identified that the commercialization of SWIFT could happen "within a year."

According to SSI's February 16, 2018 supplemental answer, GE's representatives "did not deny that GE had promised SSI and Dr. Garwood that it would commercialize SWIFT, and that GE had failed to comply with its obligation to

---

[1]     The "context" SSI provided about the days leading up to the September 12, 2014 promise discloses critical details that are relevant to disputed legal issues in this case. For example, the revelation that GE had represented in August 2014 that the commercialization of SWIFT could happen in a neuro application "within a year" directly implicates a potential defense to a post-APA contract claim under Minnesota's statute of frauds. *See SL Montevideo Tech., Inc., v. Eaton Aerospace, LLC*, 292 F. Supp. 2d 1173, 1180 (D. Minn. 2003) (concluding that plaintiff's implied contract claim failed under Minn. Stat. § 513.01(1) because the alleged agreement by its terms was not to be performed within a year). As explained below, SSI also identified that Mr. Polzin and Mr. Ahluwalia discussed commercialization of SWIFT with a CEO of part of GE's business shortly before making the alleged September 12, 2014 promise; this introduces facts relevant to GE's contention that its personnel lacked authority to bind the company. *See New Millennium Consulting, Inc. v. United HealthCare Services, Inc.*, 695 F.3d 854, (8th Cir. 2012) (discussing requirements of actual and apparent authority for an agent to bind a principal under Minnesota law). SSI downplays the significance of these additions of "context" by suggesting that it was not identifying any new promises. However, the reality is that SSI's late supplementation introduced significant facts at the end of the discovery period that altered the legally relevant landscape of its claims.

do so." [*Id.* at 11.] Instead Mr. Polzin and Mr. Ahluwalia acknowledged the slow progress and apologized for the failure to commercialize SWIFT and the harm caused to Dr. Garwood's reputation and career as a result. [*Id.*] Mr. Polzin and Mr. Ahluwalia said that they would bring up the issue at a September 3, 2014 meeting with Richard Hausmann, GE's CEO and President of the Global MR Business for GE Healthcare. [*Id.*] Then, when GE's representatives called Mr. Cunagin on September 12, 2014 and made one of the post-APA promises, they "informed Mr. Cunagin that Mr. Hausmann and his leadership team . . . agreed to SSI's demands that GE reconfirm its commitment to SSI to commercialize SWIFT." [*Id.*] GE agreed to commercialize SWIFT as soon as practicable and said that it would implement SWIFT in a "'Silent Brain' or neuro application." [*Id.*] Finally, GE's representatives "stated that GE had put money into SWIFT and that SWIFT solved some key technical hurdles in the current technique (RUFIS)." [*Id.* at 11–12.]

Finally, SSI disclosed for the first time that Eric Stahre, GE's new CEO and President of the Global MR Business for GE Healthcare, allegedly authorized the September 12, 2014 promise. Specifically, SSI states that Mr. Stahre "affirmed GE's agreement to commercialize SWIFT" in a telephone call in January of 2015. [*Id.* at 12.]

On February 23, 2018, GE's counsel complained that SSI's January 25, 2018 and February 16, 2018 supplemental answers to GE's Interrogatory No. 1 were untimely. [ECF No. 141-15.] GE specifically raised issues with the late disclosure of several promises that were entirely new and about the late revelation of important details regarding promises that had been mentioned earlier. [ECF No. 141-15 at 4–6.]

## B.   Discussion

In its motion, GE requests that SSI be prohibited from offering evidence on any motion, at any hearing, or at trial about portions of the information disclosed in SSI's second and third supplemental responses to GE's Interrogatory No. 1. Specifically, GE asks the Court to exclude evidence concerning: (1) promises allegedly made during the August 29, 2014 meeting in Wisconsin, and in January 2015 by Mr. Stahre; (2) Mr. Hausmann's alleged approval of GE's agreement to SSI's demands for reconfirmation of GE's commitment to commercialize SWIFT, which was allegedly conveyed as part of the September 12, 2014 promise; and (3) GE's alleged statement that GE would implement SWIFT's commercialization in clinical scanners

in a "Silent Brain" or neuro application, and that it could do so within a year. [GE's Mem. in Supp. of Mot. to Strike at 20–21, ECF No. 140.]

There can be no dispute that SSI's January 25, 2018 supplementation provided important additional information regarding its post-APA claims with very little time left in the schedule, and its February 16, 2018 supplementation did so on the last day of the discovery period. The questions facing the Court begin with whether SSI's late supplementation was nevertheless made "in a timely manner" for purposes of Rule 26(e)(1). The Court must also ask whether any failure to make timely supplementation was substantially justified or harmless. If the supplementation was not timely, was not substantially justified, and was not harmless, the Court must finally determine whether exclusion is justified or whether another course of action is appropriate.

### Timeliness and Substantial Justification

The issues of timeliness and substantial justification both implicate the reasons why SSI did not disclose the information it provided until the end of the discovery period. SSI states that its late supplementation was timely and substantially justified because SSI provided the information in January and February of 2018, shortly after Mr. Cunagin and Mr. Kopischke began preparing for their depositions. SSI represents that Messrs. Cunagin and Kopischke are busy professionals operating a new business venture, and they had a difficult time recalling all of the details about the post-APA promises that GE allegedly made several years ago to commercialize SWIFT. They both state that their focus in the early period of this case was on the HeartVista program that they spent months developing in response to GE's September 2014 promise. Because of this early emphasis, they did not recall the other promises or details of promises made by GE until they reviewed materials in preparation for their depositions. [Cunagin Decl., ECF No. 147; Kopischke Decl., ECF No. 148.] SSI asserts that the disclosures of the newly identified promises and details at the end of the discovery period were therefore timely because SSI supplemented its interrogatory response as soon as SSI's principals shared the information with counsel.

To put it bluntly, the Court is disappointed in SSI's handling of its response to GE's interrogatory concerning post-APA promises, and it shares GE's frustration about the late disclosures. Throughout this litigation, GE has endeavored, with minimal and belated success, to discern the true nature of SSI's claims related to a

post-APA contract or actionable promises.[2] Of course, people have a difficult time remembering details about events that happened years in the past and SSI's principals cannot be expected to have perfect memories. However, SSI chose to bring this lawsuit and to base two of its claims on several unidentified post-APA promises. SSI knew for months that GE needed to learn the details about those alleged post-APA promises and SSI had months to provide GE the most basic information about its post-APA case. Instead, SSI waited until the very end of the discovery period to fulfill its discovery obligation. The proffered explanation that SSI's two employees only recalled critical details when they started reviewing information on the eve of their depositions suggests either that SSI did not act diligently to answer GE's discovery request earlier in the case, or that SSI's counsel did not act diligently in requiring SSI's principals to do so.

GE's service of Interrogatory No. 1 in July of 2017 triggered SSI's obligation to act with reasonable diligence to provide GE with the responsive information in SSI's possession, custody, or control. Such a diligent response requires corporate employees to conduct a reasonable investigation so that the company can answer an interrogatory. *3M Innovative Properties Co. v. Tomar Elec.*, No. 05-cv-756 (MJD/AJB), 2006 WL 2670038, at *6 (D. Minn. Sept. 18, 2006) (requiring a company responding to a discovery request to conduct a reasonable investigation to fully respond to interrogatories and document requests); *Hickman v. Wal-Mart Stores, Inc.*, 152 F.R.D. 216, 223 (M.D. Fla. 1993) (same).

---

[2]   The precise scope of GE's post-APA breach of contract and promissory estoppel claims has also eluded the Court. The issue of SSI's incomplete disclosure of the alleged post-APA promises first came to the Court's attention when GE moved to dismiss the original complaint on May 12, 2017. [ECF No. 15 at 8, 13–17.] SSI added only one example of the alleged "repeated" promises when it amended its complaint a week later. SSI's failure to disclose the full extent of the promises came up again during the September 12, 2017 hearing on the motion to dismiss. [*See* ECF No. 63 at 7–8 (discussing SSI's failure to disclose the substance of post-APA promises in an initial complaint, amended complaint, and in response to an interrogatory); *id.* at 23 (THE COURT: "One of the things that I'm grappling with is the lack of specificity around the promises, the consideration, and, frankly, the indication that there's an intent to induce.").]

The record here shows that instead of diligently reviewing documents to give GE the information to which it was entitled, Mr. Cunagin and Mr. Kopischke waited until early 2018 to review documents to help identify the alleged representations made by GE that formed the basis of claims in the Amended Complaint in May of 2017. Mr. Kopischke states that he reviewed nearly 8,000 emails to prepare for his deposition in early 2018, and it was then that he remembered details of the additional promises disclosed at the end of the discovery period. [Kopischke Decl ¶¶ 4, 6.] Mr. Cunagin provides a similar account of reviewing documents between mid-January and February of 2018 in preparation for his deposition and then learning additional information about post-APA promises. [Cunagin Decl. ¶¶ 5–6.] However, it is clear from SSI's statement in the Amended Complaint that it believed there were "repeated" post-APA promises; counsel for SSI knew that they would need to provide more detailed information. There is nothing in the record that suggests Messrs. Cunagin and Kopischke could not have reviewed the same documents earlier in the case, which would have allowed SSI to tell GE what the promises were that formed the basis of SSI's post-APA claims. SSI certainly does not allege that the information Mr. Cunagin and Mr. Kopischke ultimately reviewed to refresh their recollections was unavailable until the end of the discovery period. *See* 8A C. Wright & A Miller, *Fed. Prac. & Proc. Civ.* § 2049.1, 1993 Expansion of Duty to Supplement or Correct (3d ed.) ("[T]here is no excuse under the restyled rule for failure to supplement where the information was in the responding party's possession at the time the incomplete response was made.").

Instead, SSI's principals state that they decided to focus on the HeartVista program earlier in the case. SSI's own explanation for why it supplemented its responses so late in the game shows that SSI's failure to provide the information earlier in the case was the product of a choice, not simply imperfect memory. SSI treated its duty to respond to GE's interrogatory about post-APA promises as an afterthought. Its last-minute disclosure is not made timely or substantially justified merely because SSI's two employees chose to wait until the end of the discovery period to familiarize themselves with information available to the company earlier in the litigation.

To be clear, the Court is not reaching this conclusion based on the notion that any time a party brings a claim it must remember and reveal every fact relevant to that claim right at the outset of the case. If that were required, there would be no need for

Rule 26(e) to permit supplementation of disclosures or interrogatory answers. But where, as here, a plaintiff knows at the start of the litigation that it has deprived the defendant of information that is essential to understanding the reason it is being sued, the plaintiff cannot wait until the end of the discovery period to review the information that will allow it fully answer an interrogatory aimed at gathering precisely that undisclosed information. The information disclosed by SSI at the very end of discovery in this case goes well beyond mere details, and includes facts that form essential elements of SSI's post-APA contract and promissory estoppel claims.

SSI relies on *Ventura v. Kyle*, No. 12-cv-472 (RHK/AJB), 2013 WL 12145009 (D. Minn. Feb. 28, 2013), to argue that its close-of-discovery supplementation was timely. SSI's reliance on *Ventura* is misplaced. In reasoning that exclusion was not warranted where the plaintiff provided a supplemental answer to an interrogatory with only two weeks to go in the discovery period, the *Ventura* court noted that "Defendant may object that Plaintiff's supplementation was not made in a 'timely manner' given that the documentary record Plaintiff relies on was available for some time prior to Plaintiff's supplementation, but Plaintiff's supplemental responses were made within the discovery period and months before the dispositive motion deadline and trial date." *Id.* at *2. However, this is far from an endorsement of timeliness and justifiability of a late disclosure, and it says nothing about how to interpret late supplementation of the type that occurred here. SSI's representatives have merely stated that "during the initial months of discovery" they focused on matters of greater concern to them, but waited until the very end of the discovery period to review information for their depositions. As noted above, the Court can only infer from this record that SSI viewed focusing on its litigation priorities as more important than actually identifying the post-APA promises that formed the very basis of two of SSI's claims. The *Ventura* court's observation does not address this scenario.

In sum, the Court finds that SSI's January 25, 2018 and February 16, 2018 supplementation was not "timely" for purposes of Rule 26(e)(1). The Court also finds that SSI's failure to timely supplement was not substantially justified for the same reasons.

### Harmlessness

Whether a failure to timely supplement is harmless for purposes of Rule 37(c)(1) sanctions is really a question of prejudice. Here the focus is on how

SSI's untimely and unjustified disclosure of significant details about post-APA promises affected GE and whether anything short of exclusion of evidence can remedy whatever harm was done. GE described suffering two types of harm here, one of which is far more compelling than the other.

First, in GE's memorandum in support of its motion, it set forth a tenuous theory of the prejudice it claims to have suffered due to SSI's untimely disclosures. [GE's Mem. in Supp. of Mot. to Strike at 28–33.] Specifically, GE asserted that because SSI had not revealed the details of the alleged post-APA promises, GE's own witnesses were unable to review the necessary information prior to their depositions, which caused GE's witnesses to admit they did not have a detailed or specific recollection about certain events and conversations. GE argued that this creates an unfair record, making its own witnesses' recollections seem hazy by comparison to the sharper recollections reflected by SSI's witnesses during their depositions, who were specifically prepared regarding the promises.[3] In turn, GE argues this would allow SSI to unfairly impeach GE's witnesses with their fuzzier deposition testimony should they testify more definitively at trial.

Frankly, the Court finds this alleged harm to be speculative and relatively insignificant. To the extent that GE remains concerned about this potential prejudice, however, those concerns were rendered moot at the hearing. At the hearing on the current dispute, SSI's counsel committed to not attempting to impeach GE's witnesses with their prior testimony reflecting lack of memory on any details about post-APA promises that were not disclosed until after those witnesses were deposed.[4]

---

[3]     It is noteworthy that GE also deposed Messrs. Cunagin and Kopischke after the late disclosures were made, meaning that GE was able to obtain relevant testimony about all the post-APA promises from SSI's own witnesses despite the belated supplementation of answers to Interrogatory No. 1. As a result, there is no basis to conclude that GE was prevented from asking SSI's witnesses questions about undisclosed promises.

[4]     At the hearing, the Court asked SSI's counsel whether he would agree not to engage in such impeachment or yield to an order to that effect. The Court interprets SSI's counsel's response as an agreement to refrain from such impeachment, making an order unnecessary.

[Apr. 19, 2018 Hr'g Tr. at 78:17–24, ECF No. 187.] The Court finds that this commitment cures this aspect of alleged prejudice caused by SSI's late disclosures, and as a result, exclusion is not required to prevent this identified form of harm.

At the hearing, GE articulated another way in which SSI's January 25, 2018 and February 16, 2018 supplementations are prejudicial, one that is more of a concern than the possibility of impeachment with fuzzy recollections described above. Because SSI did not disclose any information about GE's alleged commitment to commercialize SWIFT in a neuro application "within a year" until the last day of discovery, GE was unable to prepare its defense during the discovery period to address that specific assertion. Had SSI made this assertion earlier in the case, GE could have developed a defense to that claim, including marshaling its own facts to demonstrate that performance of such a promise within a year would be so impossible or impractical as to render the existence of such a promise unlikely or unenforceable. [*See* Apr. 19, 2018 Hr'g Tr. at 57:24–58:18.] The Court is persuaded that SSI's untimely and unjustified disclosure of the "within a year" commercialization promise was prejudicial to GE because it interfered with GE's ability to prepare its defense on this point, or to use this fact to strengthen its defense in other areas.

The Court also finds that SSI did not provide any information about the involvement of Mr. Hausmann or Mr. Stahre in making post-APA promises until the very end of the discovery period. These allegations are significant because Mr. Hausmann and Mr. Stahre are current and former CEOs of GE, making any promises made by them simultaneously more significant and arguably less likely. The late disclosure of their alleged involvement prevented GE from preparing a defense that addressed these allegations, a reality that cannot be dismissed as harmless.

### Appropriate Sanction

Having found that SSI's untimely and unjustified late supplementation of its response to GE's Interrogatory No. 1 was prejudicial in some respects, the Court must consider whether the exclusion of evidence of the late-disclosed facts as authorized by Rule 37(c)(1) is appropriate or whether some other remedy better addresses the harm. Here, the Court concludes that exclusion of evidence is not warranted because a brief continuance can cure any prejudice to GE.

With respect to the serious sanction of exclusion, the Court concludes that it is not necessary to remedy the prejudice to GE. For one thing, exclusion might prove

unworkable given the reality that the facts that were not revealed in a timely manner are intertwined with facts that were timely disclosed and the evidence at issue will be introduced through narrative testimony of lay witnesses rather than through experts or easily excludable documents. More importantly, the availability of a continuance to cure the prejudice is particularly persuasive under these circumstances. A modest extension of the discovery deadline for GE will allow it to develop its defense regarding the last-minute disclosures, including the alleged promise to commercialize SWIFT in a neuro application within a year, Mr. Hausmann's alleged authorization of the September 12, 2014 promise, and Mr. Sahtre's alleged ratification of earlier promises in January of 2015. The Court also grants GE's alternative request to permit it to supplement its Rule 26(a)(1) disclosures to add Mr. Stahre as a witness.

## IV.   SSI's Motion

SSI asks the Court to impose Rule 37(c)(1)'s exclusion sanction against GE because GE failed to provide timely supplementation of its responses to four different interrogatories (Interrogatories 2, 3, 6 and 7). As a remedy for this alleged failure, SSI seeks exclusion of all information included in supplemental responses to Interrogatories 6 and 7, and seeks exclusion of any evidence in support of a lengthy list of defenses set forth in GE's Answer. For the reasons that follow, the Court concludes that exclusion is not appropriate, and that no other sanction is justified.

### A.   SSI's Discovery Regarding GE's Defenses and ATD Programs

On July 31, 2017, SSI served GE with its First Set of Interrogatories, which includes Interrogatories 2, 3, 6, and 7. Interrogatory 2 asked GE to disclose the factual basis for any contention that GE was not liable for a breach of the APA. Interrogatory 3 asked GE to disclose the factual basis for any contention that GE was not liable for breach of a claimed post-APA agreement. SSI asserts that with these contention interrogatories, SSI sought information about the basis for GE's defenses in the litigation, including any contention that SSI could not meet its burden of proof on its breach of contract claims and any affirmative defense for which GE bears the burden.

SSI's Interrogatory 6 asked GE to describe all of its policies and procedures applicable to ATD programs. Interrogatory 7 asked GE to describe every ATD program that related to Silent MRI Technology. These interrogatories seek facts about

GE's ATD programs generally and the specific ATD programs that GE has conducted that deal with the type of technology at issue in this case.

### GE's Initial Response

On August 30, 2017, GE served its initial response to SSI's Interrogatories. With respect to Interrogatories 2 and 3, GE's answer did not include much of a narrative response describing the factual basis for its defenses. Instead, GE stated that it would be providing documents as part of ongoing production and asserted that the information responsive to Interrogatories 2 and 3 could be discerned from that production.

In response to Interrogatory 6, GE identified one document by Bates number. And in response to Interrogatory 7, GE provided some information about an ATD program that was created to evaluate SWIFT. GE also pointed to a lengthy series of Bates-labeled documents related to that ATD program.

### GE's First Supplemental Responses

On November 7, 2017, GE expanded upon its responses to Interrogatories 2 and 3 in a supplemental response. In response to Interrogatory 2 regarding the APA, GE stated that: (1) it complied with all its obligations under the APA; (2) it conducted an ATD program to evaluate SWIFT between 2011 and 2012; and (3) it determined that SWIFT was not appropriate for progression to a marketing program after evaluating its clinical and technical feasibility. GE also pointed to a large collection of Bates-labeled documents pursuant to Rule 33(d).

In response to Interrogatory 3 regarding any post-APA agreement, GE stated that: (1) the APA was an integrated contract that prohibited oral modification or amendment; and (2) "there is no 'post-APA agreement' by which GE promised 'to commercialize SWIFT,' and as such, GE cannot be liable for breach of a contract which does not exist." Again, GE pointed to a list of Bates-labeled documents pursuant to Rule 33(d). Of course, as discussed above in Part III of this Order, at this point SSI had not yet disclosed complete information about the alleged promises forming the basis of its post-APA claims; nor had SSI identified which post-APA promises formed enforceable contracts or agreements.

### GE's Answer to the Amended Complaint

On January 31, 2018, GE complied with the Court's Order allowing it to serve and file its Answer to the Amended Complaint within 14 days after the District Court's resolution of the partial motion to dismiss. [Ans., ECF No. 122.] In its Answer, GE asserts twenty-one separate "affirmative defenses," but the list includes both actual affirmative defenses for which GE would bear the burden and many other "defenses" that really amount to assertions that SSI would be unable to meet its burden of proof in various respects. [Ans. ¶¶ 64-84.] On the last day of January, there were just over two weeks until the close of fact discovery on February 16, 2018.

### GE's Last Supplemental Response

On the final day of the discovery period, GE provided a supplemental response to the four interrogatories at issue. With respect to Interrogatory 2, GE asserted that as a result of the District Court's Order on the partial motion to dismiss, SSI's breach-of-the-APA claim is limited to whether GE failed to create an ATD program. GE asserts that it did not breach the APA because it created an ATD program, and referred SSI to its further description in its supplemental answer to Interrogatory 7 (which was served the same day).

For Interrogatory 3, SSI provided the following additional information. GE explicitly denied that any post-APA promises or agreements to commercialize SWIFT were made. It specifically denied that it made any of the promises SSI had identified in response to GE's Interrogatory No. 1. GE identified a list of people with knowledge of the facts relating to GE's denial that such post-APA promises were made. GE further stated that none of the communications between its own personnel that allegedly made the post-APA promises reflect or include a promise or agreement regarding the commercialization of SWIFT. GE denied that any audio recordings of communications between GE and SSI include such promises and pointed to several Bates-labeled documents.

GE's final supplemental answer to Interrogatory 6, concerning the policies and procedures governing GE's ATD programs, also included additional information provided pursuant to Rule 33(d). GE stated that its policies and procedures for ATD programs are set forth in detail in specific Bates-labeled documents.

In its last supplemental response to Interrogatory 7, GE stated that it began planning and executing its ATD program for SWIFT in April 2011 when it began building the SWIFT development team and defining the project's scope. GE pointed to a spreadsheet, a project plan, and presentations related to the SWIFT ATD program. GE also referenced documents showing the tasks that it completed in the ATD program related to SWIFT. GE referenced email communications and additional documents showing that it was continuing to analyze SWIFT through June of 2012.

### Post-Discovery-Period Agreement and Discovery

After GE served its Answer on January 31, 2018, SSI asked GE to agree to provide additional discovery concerning the list of twenty-one defenses that GE asserted in its responsive pleading. On February 6, 2018, the parties discussed a stipulation to allow limited discovery related to GE's affirmative defenses after the close of fact discovery. On February 8, 2018, GE indicated that it agreed "in theory" to SSI's request and asked SSI to send a copy of the discovery that SSI intended to serve so that GE could consider the request. GE also provided a draft of a stipulation. [ECF No. 164-4.]

On February 9, 2018, SSI responded in a letter noting that it had just served "basic interrogatories directed to [GE's] affirmative defenses." SSI's Third Set of Interrogatories to Defendant included Interrogatories 14 through 34. Each interrogatory asked GE to describe the factual basis for the contention made in each of GE's affirmative defenses. In SSI's letter, counsel stated that "[w]e do not at this time anticipate requiring further affirmative defense discovery, but reserve the right to do so after reviewing GE's interrogatory responses." [ECF No. 164-6.]

On February 16, 2018, the parties filed a stipulation to allow limited discovery to be conducted after the fact-discovery cutoff. [ECF No. 124.] GE agreed to provide substantive responses to the new interrogatories concerning affirmative defenses by March 12, 2018, and SSI reserved the right to seek additional discovery regarding GE's affirmative defenses if necessary after receiving the interrogatory responses. [ECF No. 124 at 4.] The Court adopted the parties' stipulation. [Order (Feb. 16, 2018), ECF No. 127.]

Rather than wait for the interrogatory answers that the parties agreed GE would provide by March 12, 2018, SSI raised the issue presented by its current motion

for exclusion of evidence in a letter dated February 28, 2018. SSI sent this letter in response to GE's request that SSI withdraw portions of SSI's second and third supplemental responses to GE's Interrogatory No. 1, which, as described above, had disclosed entirely new significant information about post-APA promises. In its February 28th letter, SSI insisted, for the first time, that GE's responses to SSI's own Interrogatories 2 and 3 should have already contained the very information that SSI had just asked GE to provide in its post-discovery-period interrogatories. [ECF No. 136-5.] SSI also argued that GE had made untimely supplementation of its answers to Interrogatories 6 and 7 by providing information about the policies and procedures for ATD programs and information about the ATD program created to evaluate SWIFT on the last day of discovery. [*Id.*]

On March 12, 2018, GE served its responses to SSI's post-discovery-period interrogatories concerning the "affirmative defenses." These responses provide substantive information in narrative form about GE's position with respect to the affirmative and other defenses listed in its Answer, and referred to previously disclosed documents as well as deposition testimony. [*See, e.g.*, ECF No. 136-7 at 4–6 (describing the factual basis for GE's contention that GE fully performed its contractual obligations); *id.* at 8–9 (describing the basis for a statute of frauds defense); *id.* at 22–23 (describing authority-based defenses and denying that Mr. Polzin or Mr. Ahluwalia had authority to bind GE).] It does not appear from the record that SSI ever informed GE that the substance of these responses to the new interrogatories was deficient. Nor did SSI ask GE to allow it to conduct any additional "affirmative defense discovery," though it had reserved the right to do so after reviewing GE's responses.[5] Instead, it brought the instant motion to exclude, seeking

---

[5]        The record before the Court strongly suggests that SSI had determined that it would bring the motion to exclude evidence regardless of GE's answers to the new interrogatories. [*See* ECF No. 136-5 at p. 2 (asserting that if GE refused to withdraw a list of affirmative defenses, SSI would bring its motion to exclude evidence); *id.* at p. 4 (requesting a meeting to confer about the issues at times before GE's answers to post-discovery-period interrogatories were due).] Indeed it appears that SSI was prompted to bring its motion, not by the alleged deficiencies in the post-discovery-period interrogatory responses, but by GE's indication that it was going to bring its own motion related to insufficient disclosures of post-APA promises. To the extent that,

(*footnote continued on next page*)

to preclude GE from introducing any evidence to support almost any defense, affirmative or otherwise, on any motion or at trial.

## B.     Discussion

In its motion to exclude evidence under Rule 37(c)(1) SSI argues that GE provided untimely supplementation of its responses to Interrogatories 2, 3, 6, and 7. SSI asks the Court to prevent GE from offering any evidence relating to the following defenses:

- Estoppel, Waiver, Acquiescence, and Laches;
- Statute of Frauds;
- Statute of Limitations;
- Barred by express terms of the agreements;
- Impracticability, Impossibility of Performance, and Frustration of Purpose;
- Failure to provide notice of breach;
- Failure of consideration;
- Failure of performance;
- Promises are unenforceable, Promises are void, and Promises are indefinite;
- Absence of writing, Absence of clear and definite promise, and Absence of essential terms;
- Lack of authority, both actual and apparent;
- Failure to fulfill a condition precedent; and
- Not an enforceable contract, barred due to defects fatal to contract formation.

[SSI's Mot., ECF No. 132.] In addition, SSI asks the Court to preclude GE from offering any evidence concerning GE's policies and procedures for its ATD programs that was set forth in GE's February 16, 2018, supplemental response to Interrogatory 6. [*Id.*] Finally, SSI asks the Court to prevent GE from offering any evidence concerning GE's ATD program on quiet imaging that was set forth in GE's February 16, 2018 supplemental response to Interrogatory 7. [*Id.*] For several reasons, the Court finds that the sanction sought by SSI is inappropriate.

---

(*footnote continued from previous page*)

as GE asserts, SSI sought to make its untimely disclosures look on par with GE's discovery conduct, that effort has been unsuccessful.

*"Affirmative Defenses"*

SSI's request for exclusion of evidence regarding GE's affirmative defenses is without merit. First, particularly with respect to GE's defenses to liability for alleged post-APA promises, it strains credulity for SSI to argue that GE should have provided more information about each of its affirmative defenses regarding those promises when SSI waited until the last minute to provide details about its claims.[6] For example, SSI's own answer to GE's Interrogatory No. 1 made no reference to any basis for concluding that Mr. Ahluwalia or Mr. Polzin had the authority to bind GE to an agreement to commercialize SWIFT through a post-APA agreement until February 16, 2018. At that point SSI stated for the first time that Mr. Hausmann and Mr. Sahtre had given authorization for a post-APA promise or ratified an earlier post-APA promise. Similarly, SSI disclosed, for the first time on February 16, 2018, that GE's post-APA promises were to commercialize SWIFT in a neuro application "within a year." Because of this late disclosure, it would have been difficult, if not impossible, for GE to articulate any basis for a defense like impracticability or impossibility of performance on an earlier occasion. The Court finds that SSI's own late disclosure of essential information about its post-APA contract and promissory estoppel claims provides substantial justification for GE's provision of information about its defenses late in the discovery period and in response to the agreed upon post-discovery-period interrogatories.

Second, SSI's position essentially ignores the parties' agreement for late discovery regarding the affirmative defenses disclosed when GE served Answer to the Amended Complaint at the end of January 2018; that agreement substantially mitigates any harm to SSI in this respect. SSI argues that it has suffered prejudice because GE's answers to the agreed upon post-discovery-period interrogatories "were cursory at best." [ECF No. 133 at 24.] The Court disagrees. GE provided substantial

---

[6]     Even as recently as the hearing on the current dispute, SSI could not articulate whether GE's alleged post-APA promises formed a single post-APA agreement or an unknown number of separate agreements. [Apr. 16, 2018 Hr'g Tr. at 36:14–22.] Nor did SSI specify what the precise terms of any such agreement(s) were, including when they were actually entered into and for what consideration. It is difficult to imagine that GE could be required to specify all of its defenses to claims which, to date, remain undefined.

information in response to the final set of interrogatories. That information is certainly sufficient for SSI to evaluate the basis for GE's "affirmative defenses." SSI also complains that, although it received GE's responses to the post-discovery period interrogatories, it was foreclosed from taking any deposition or document discovery related to the "affirmative defenses." This is simply untrue. When the parties stipulated to the use of post-discovery-period interrogatories, SSI reserved the right to seek additional discovery of documents and depositions regarding GE's "affirmative defenses," if needed. However, instead of asking GE for another deposition or for production of documents, SSI chose to bring this motion before it even received GE's answers to the interrogatories. This failure to even attempt to alleviate the prejudice that SSI now claims to have suffered weighs strongly against granting SSI the relief it seeks. *See Mathers v. Northshore Mining Co.*, 217 F.R.D. 474, 483 (D. Minn. 2003) (noting that defendants were aware of plaintiffs' experts' intention to supplement his report but "did not mitigate the prejudice it now claims by preparing a supplemental report, . . . requesting a second deposition or requesting more time to obtain a supplemental report from its own expert").

Third, SSI asserts that it served Interrogatories 2 and 3 to learn information about GE's affirmative defenses because, early in the litigation, it anticipated that GE's Answer would not be served until late in the discovery period. [*See* ECF No. 133 at 6 ("SSI anticipated that the stay of GE's deadline to answer the amended complaint might result in a delay in the filing of GE's answer, including its affirmative defenses.").] Therefore, SSI argues it should not have had to wait until GE served its Answer and responded to post-discovery-period interrogatories to obtain information about GE's defenses. This argument is not persuasive. Given the way this case was litigated, one would expect SSI to have addressed the practical problems it "anticipated" could arise from a delay in receiving GE's Answer, either with the GE or the Corut. However, SSI's only communication to GE about Interrogatories 2 and 3 did not raise that issue and SSI never asked the Court to adjust the schedule to move up the Answer deadline or to move back the close of discovery.[7] The fact that

---

[7]     In fact, there is only one instance in the record, though not relied upon by SSI in its brief, suggesting that SSI raised an issue with GE's responses to Interrogatories 2 and 3 before GE served its Answer. On October 3, 2017, SSI asserted that GE's response to Interrogatories 2 and 3 were incomplete and asked for

(*footnote continued on next page*)

SSI did not bring this issue to the attention of GE or the Court suggests that GE was justified in assuming SSI did not challenge the timeliness of its disclosures regarding GE's defenses. *See Litman v. Pac. Indem. Co.*, No. 02-cv-714 (JEL/JGL), 2003 WL 25674056, at *3 (D. Minn. Feb. 20, 2003) ("At this juncture it is important to note that there is nothing in the record which indicates that Plaintiffs ever expressed dismay with the timing of Defendant's disclosures. Plaintiffs do not even argue that they contacted Defendant to discuss perceived inadequacies in Jillson's report. This lack of contact leads the Court to finds that Defendant was justified in assuming that [Plaintiff] did not challenge its compliance with Fed. R. Civ. P. 26(a)(2)(B).").

In fact, SSI only raised the issue of the adequacy of the responses to Interrogatories 2 and 3 when GE threatened to bring a motion to exclude SSI's late-disclosed post-APA promises. This reality, coupled with the fact that the parties had already reached an agreement that GE would answer post-discovery-period interrogatories, renders SSI's claim that only the harshest sanction of exclusion will do unpersuasive. *See Bison Advisors LLC v. Kessler*, No. 14-cv-3121 (DSD/SER), 2016 WL 3525900, at *13 (D. Minn. Jan. 21, 2016) ("When these practical remedies are available to cure any prejudice to Defendants, the harsh sanction of excluding portions of expert reports is not the appropriate remedy, and Defendants desire for only the harshest sanction undermines their assertion of prejudice.").

### Interrogatory 6

SSI's efforts to exclude GE's final supplementation of its answer to Interrogatory 6 fare no better. Rule 26(e)(1) requires supplementation of an interrogatory answer in a timely manner when the party learns its previous answer was incomplete or incorrect and the additional or corrective information "has not

---

(*footnote continued from previous page*)

supplementation. However, SSI's letter did not raise concerns about how late GE's Answer would be served or suggest a modification to the schedule. SSI also did not raise any issue with respect to these contention interrogatories when the parties sought the Court's ruling on an informal discovery dispute later in October of 2017. [*See* Letter from L. Ellingson to Menendez, M.J. (Oct. 30, 2017) (on file with the Court); Letter from L. Ellingson to N. Frank (Oct. 3, 2017) (on file with the Court).]

otherwise been made known to the other parties during the discovery process or in writing." Fed. R. Civ. P. 26(e)(1)(A). With respect to Interrogatory 6, GE did not fail to provide supplemental information as required by Rule 26(e)(1) that would potentially trigger an exclusion sanction under Rule 37(c)(1) because the information GE added in its supplemental response had been made known to SSI during the discovery process.

In response to Interrogatory 6, GE represents that its final supplemental answer added references to two documents, both of which had been produced on September 22, 2017, almost five months before. [GE's Opp'n Mem. at 27–29, ECF No. 163.] One of the two documents was even marked and used rather extensively by SSI as an exhibit during a Rule 30(b)(6) deposition of GE. [*Id.* at 28.] Because GE's February 16, 2018 supplementation of its responses to SSI's Interrogatory 6 did not introduce anything that was new to SSI, Rule 37(c)(1) sanctions are not appropriate.

### Interrogatory 7

SSI's argument regarding Interrogatory 7 suffers from the same infirmity. GE's February 16, 2018 supplemental response to Interrogatory 7 referenced 38 documents and provided additional narrative about the ATD program that GE conducted for the SWIFT technology. GE represents that of these 38 documents, "35 were marked as exhibits in depositions: 34 were marked by SSI in its depositions of GE witnesses between December 19, 2017, and January 30, 2018, and one was marked by GE in its deposition of former SSI consultant and GE employee Steen Moeller on February 2, 2018." [GE's Opp'n Mem. at 29.] The other three documents that GE referenced were produced on either August 16, 2017 or September 22, 2017. [*Id.* at 30.] The identification of these 38 documents in the February 16, 2018 supplemental answer to Interrogatory 7 does not constitute a failure to provide information as required by Rule 26(e) because the information had otherwise been made available to SSI during the discovery process. Any claim of surprise about the relevance of these documents is belied by the record. GE's addition of them to its written answer is therefore not a basis for sanctions under Rule 37(c)(1).

SSI also argues that GE's supplemental response to Interrogatory 7 is untimely and inappropriate because it includes a narrative response that was not provided until the last day of discovery. However, the narrative discussion GE added to its response

to Interrogatory 7 merely describes each of the documents, and does not improperly chart new territory.

In sum, SSI's efforts to preclude GE from introducing most of its defenses and from relying on documents previously disclosed but ultimately cross-referenced on the last day of discovery are unavailing. The Court concludes that the complained-of disclosures were not only not untimely when considered in context, but any harm to SSI created by the late-in-discovery revelations could easily have been cured by SSI through the post-discovery-period process they had already explored with GE. The exclusion of evidence requested by SSI is unwarranted.

## V.     Order

For the reasons discussed above, **IT IS HEREBY ORDERED THAT**:

1.     SSI's Motion to Exclude Evidence Not Disclosed in Response to Interrogatories **[ECF No. 132]** is **DENIED**.

2.     GE's Motion to Strike Portions of Plaintiff SSI's Second and Third Supplemental Answers to Interrogatory No. 1 **[ECF No. 138]** is **DENIED IN PART** to the extent it seeks to preclude the use of evidence pursuant to Fed. R. Civ. P. 37(c)(1), and **GRANTED IN PART** to the extent that GE is permitted to:

   a.   Supplement its Rule 26(a)(1) disclosures as provided in this Order; and

   b.   Conduct additional discovery relating to the information disclosed for the first time in SSI's Second and Third Supplemental Answers to Interrogatory No. 1.

3.     The Scheduling Order [ECF No. 38] is **HEREBY AMENDED** as follows:

   a.   Any additional fact discovery relating to the matters embraced by SSI's last two responses to GE's Interrogatory No. 1 shall be commenced in time to be completed by **July 6, 2018**.

   b.   Any non-dispositive motions and supporting documents shall be filed and served on or before **July 27, 2018**.

    c.  Dispositive motions and supporting documentation shall be served and filed by the moving party on or before **September 10, 2018**.

    d.  This case shall be ready for a jury trial at least 45 days after an order on any dispositive motions. The anticipated length of trial is **5-10** days.

Date: May 2, 2018

*s/ Katherine Menendez*
Katherine Menendez
United States Magistrate Judge