## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| STEADY STATE IMAGING, LLC, | Civil No. 17-1048 (JRT/KMM) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION & ORDER** |
| GENERAL ELECTRIC COMPANY, | |
| Defendant. | |

Devin Padmanabhan and Paul Robbennolt, **PADMANABHAN & DAWSON, P.L.L.C.,** 45 South Seventh Street, Suite 2315, Minneapolis, MN 55402, for plaintiff.

Marla Butler, Logan Drew, and Francois Ecclesiaste, **ROBINS KAPLAN LLP,** 800 LaSalle Avenue, Suite 2800, Minneapolis, MN 55402, for defendant.

This case arises out of a contract dispute between Plaintiff Steady State Imaging, LLC ("SSI") and Defendant General Electric Company ("GE"). SSI is a Minnesota corporation that focuses on the development of a magnetic resonance imaging ("MRI") technique known as Sweep Imaging with Fourier Transform, or "SWIFT." In 2011, SSI and GE entered into a contract to explore the commercial development of SWIFT technology. SSI brought this action in May 2017, alleging two counts of breach of contract, breach of the implied covenant of good faith and fair dealing, and promissory estoppel. This Court dismissed SSI's breach of good faith and fair dealing claim in January 2018.

1

Presently before the Court are four motions: GE's motion for summary judgment on all remaining claims; two motions by GE to exclude expert testimony; and SSI's motion to exclude expert testimony. Because SSI has not shown that it suffered damages as a result of GE's breach of the 2011 contract, the Court will grant summary judgment for GE on Count I. Because genuine disputes of material fact exist as to whether GE entered into and breached subsequent contracts to commercialize SWIFT, the Court will deny summary judgment as to Counts III and IV. Finally, because the expert testimony in issue is sufficiently supported, relevant, and reliable, the Court will deny SSI's and GE's motions to exclude expert testimony.

## BACKGROUND

### I.    SWIFT and SSI

SWIFT is an MRI technique notable for its abilities to operate quietly and create images of tissues that conventional MRI technologies are unable to produce. (Am. Compl. ("Compl.") ¶¶ 9-10, May 19, 2017, Docket No. 22.) It was developed in the early 2000s by Dr. Michael Garwood at the University of Minnesota. (*Id.* ¶ 11; (Decl. of Marla Butler ("Butler Decl.") ¶ 66, Sept. 10, 2018, Docket No. 205, Ex. 65 ("Garwood Dep.") at 28, Docket No. 288.) The University of Minnesota maintains ownership over the various patents created in the development of SWIFT. (Compl. ¶ 12.)

In 2005, Garwood founded SSI to develop and commercialize SWIFT technology. (Compl. ¶ 15; Garwood Dep. at 30-31.) In December 2006, the University of Minnesota licensed the SWIFT patents to SSI pursuant to an exclusive patent license agreement

("PLA"). (Butler Decl. ¶ 3, Ex. 2 ("PLA"), Sept. 10, 2018, Docket No. 220.) The PLA required SSI to use reasonable efforts to commercialize SWIFT technology. (PLA ¶ 5.1.) It also permitted SSI to sublicense its rights or assign all of its rights and duties subject to certain conditions. (PLA ¶¶ 3.1.2, 3.1.3.)

## II.    The Asset Purchase Agreement

Hoping to eventually transfer SWIFT technology to a major manufacturer of MRI scanners, SSI engaged in conversations about SWIFT with several companies, including Siemens and GE. (Garwood Dep. at 44-47.) In 2009, Siemens and SSI drafted a contract that would require Siemens to "explore and evaluate the market potential of SWIFT technologies." (Decl. of Troy Kopishcke ("Kopishcke Decl.") ¶ 21, Oct. 15, 2018, Docket No. 347, Ex. K7 at 3, Docket No. 354.) However, SSI ultimately decided to enter an agreement with GE instead of Siemens, and on April 5, 2011, SSI and GE executed an asset purchase agreement ("APA"). (Butler Decl. ¶ 2, Ex. 1 ("APA"), Sept. 10, 2018, Docket No. 218.) The APA contains the following provision:

> [GE] shall have no obligation to pursue the commercialization of any Additional Payment Product or use any specific level of efforts if [GE] chooses to commercialize any Additional Payment Product. Notwithstanding the preceding sentence, (1) following the Closing, [GE] shall create, in accordance with its standard policies and procedures, an ATD Program with respect to the SWIFT Technology and (2) if, following the completion of the ATD Program, [GE] determines in its sole discretion that an NPI Program is appropriate for any product using the SWIFT Technology, [GE] shall create, in accordance with its standard policies and procedures, an NPI Program with respect to such product.

(APA ¶ 2.2(a)(iv)(D).) The APA defines an "ATD Program" as:

> [GE's] investigative research and development program whose
> purpose is to evaluate the clinical and technical feasibility of a
> new technology and to reduce the clinical and technical risks
> of commercializing the technology . . . and whose output is
> used to determine the appropriateness of the technology for
> inclusion in an NPI program.[1]

(*Id.* ¶ 9.1.)

GE's internal guidance documents provide additional information on how GE runs its ATD programs. According to the MR Advanced Technology Development Guidance Document ("MR Guidance Document"), an ATD program should follow five steps, or "technology milestones." (Butler Decl. ¶ 4, Ex. 3 ("MR Guidance Doc.") at 4-12, Sept. 10, 2018, Docket No. 222.) There are specific tasks required to complete each milestone. (*See, e.g.*, MR Guidance Doc. ¶ 6.1.2.) Two milestones mention "down selection," which is not defined but appears to refer to the process of comparing technological alternatives. (*See id.* ¶¶ 6.1.2, 6.1.3.) At the end of each milestone, a technical review is held to determine whether the program should move forward into the next phase. (*Id.* ¶ 6.2.)

If GE decided to commercialize SWIFT following completion of an ATD program, the APA required it to make royalty payments to SSI for each sale. (APA ¶ 2.2(a).) Finally, the APA required amendments, modifications, and supplements to be in a signed writing. (APA ¶ 8.7.)

---

[1] In turn, the APA defines "NPI Program" as "[GE's] business program for pursuing the launch of a new product." (APA ¶ 9.1.)

### III.    Post-APA Events

After execution of the APA in April 2011, GE employees began internal discussions about plans for the SWIFT ATD Program (the "ATD Program"). (*See* Butler Decl. ¶¶ 7-8, Exs. 6-7, Sept. 10, 2018, Docket Nos. 228, 230.) By the end of May 2011, GE had determined which employees would be assigned to the ATD Program, outlined goals for the following 3-6 months, held a meeting to introduce employees to SWIFT, and established a rough timeline for the various phases of the ATD Program.[2] On May 20, 2011, the ATD Program team met to discuss its plans. (*See* Butler Decl. ¶ 16, Ex. 15, Sept. 10, 2018, Docket No. 242.) The ATD Program team held bi-weekly meetings through July 11, 2011. (*See* Butler Decl. ¶¶17-19, Exs. 16-18, Sept. 10, 2018, Docket Nos. 243-45.)

By June 2011, GE had begun comparing SWIFT with another MRI technology known as RUFIS. (*See* Butler Decl., ¶¶ 22-26, Exs. 21-25, Sept. 10, 2018, Docket Nos. 248-52.) The following month, the ATD Program team began to express concern with the results of the comparison, with one team member indicating that SWIFT's results as compared to RUFIS were "very very concerning." (Butler Decl. ¶ 27, Ex. 26 at 2, Sept. 10, 2018, Docket No. 253.) As such, Jason Polzin, GE's Chief Engineer for Global MR, predicted "slow[ing] down the effort on SWIFT." (*Id.*)

SSI's President, Troy Kopischke, first learned that GE was working on RUFIS in November 2011 at the Radiological Society of North America ("RSNA") conference. (2d

---

[2] (*See* Butler Decl. ¶ 7, Ex. 6, Sept. 10, 2018, Docket No. 228; *id.* ¶ 9, Ex. 8, Sept. 10, 2018, Docket No. 232; *id.* ¶ 11, Ex. 10, Sept. 10, 2018, Docket No. 236; *id.* ¶ 15, Ex. 14, Sept. 10, 2018, Docket No. 241.)

Decl. of Troy Kopischke ("2d Kopischke Decl.") ¶ 8, Oct. 15, 2018, Docket No. 346.)
When Kopischke approached a "Quiet MRI" display in GE's technology pavilion, GE's
Chief Technology Officer, Mike Harsh, told him that the technology displayed was RUFIS
technology and that GE would be introducing a RUFIS product before it introduced a
SWIFT product. (*Id.*; Butler Decl. ¶ 38, Ex. 37 ("Kopishcke Dep." at 145-46, Sept. 10,
2018, Docket No. 264.) Kopischke described feeling "sick to [his] stomach" after that
conversation. (*Id.* at 146.) While he remembered discussing RUFIS before execution of
the APA, he had no idea that GE was in fact pursuing RUFIS and had expected a SWIFT
product to be launched at the same conference. (*Id.* at 145-46.)

Kopischke states that when he and SSI's CEO, Danny Cunagin, first visited GE's
booth that day, Mr. Harsh assured them not to worry because GE would "release SWIFT
second," after it introduced RUFIS. (*Id.* at 146.) He also states that during a second visit
to the booth, GE's General Manager for Premium MR, Jacques Coumans, told them that
GE was "committed to . . . doing a neuro application with SWIFT." (*Id.* at 219; 2d
Kopischke Decl. ¶ 9.) In a letter to SSI shareholders that December, Cunagin relayed that
his interactions with GE senior management at the RSNA conference had given him
confidence that GE would "release quiet MRI into the marketplace sometime in 2012" and
would "play a key role in quiet MRI." (2d Kopischke Decl. ¶ 9, Ex. K2 at 3, Oct. 15, 2018,
Docket No. 349.) However, he also told shareholders that GE had been "careful not to
make any firm commitments on timing." (*Id.*)

In April 2012, Kopischke, Cunagin, and Garwood went to the annual meeting of the
International Society for Magnetic Resonance in Medicine ("ISMRM"). (2d Kopischke

6

Decl. ¶ 10.) There, they had informal conversations with GE representatives, including Jason Polzin. (*Id.*) Kopischke recalls that GE representatives told them that GE had a working SWIFT prototype and that they were in the process of optimizing it on GE scanners. (*Id.*) During a meeting with an SSI shareholder in May 2012, Kopischke communicated that they had spoken with GE and believed that GE's work on revamping SWIFT for its scanners was progressing and would be done in 2013. (2d Kopischke Decl. ¶ 11, Ex. K4 at 2, Oct. 15, 2018, Docket No. 351.) In reality, however, there was no SWIFT-capable scanner or prototype–a fact which SSI would not become aware of until much later. (1st Decl. of Paul Robbennolt ("Robbennolt Decl.") ¶ 3, Oct. 15, 2018, Docket No. 359, Ex. R2 ("Peters Dep.") at 94, Docket No. 361; Kopischke Dep. at 264.)

Kopischke, Cunagin, and Garwood attended the ISMRM conference again in April 2013. (2d Kopischke Decl. ¶ 13.) They met with GE representatives, including Jacques Coumans, Jason Polzin, and Baldev Ahluwalia, GE's then-General Manager of Premium MR. (*Id.*) Frustrated with GE's lack of progress on SWIFT, the SSI employees expressed their concerns to GE. (*Id.*) In response, Coumans purportedly "put his arm around Mike Garwood and promised him that GE would commercialize SWIFT." (Butler Decl. ¶ 37, Ex. 36 ("Pl.'s Answer to Interrog.") at 7, Docket No. 205-3.) Coumans also told Kopischke and Cunagin that they would make money from SWIFT commercialization. (*Id.* at 9.) Polzin and Ahluwalia likewise told the SSI employees not to worry "because GE would commercialize SWIFT as soon as practicable." (*Id.* at 9.)

In May 2013, Polzin and Ahluwalia contacted Kopischke and Cunagin and represented that while they were interested in moving forward with SWIFT

commercialization, GE needed SSI's assistance.  (*Id.* at 8.)  Specifically, GE needed assistance with "applications that leverage the SWIFT technology" and "making SWIFT run on conventional MRI hardware." (*Id.* at 9.)  In response, in June 2013, Kopischke "provided information to GE about SWIFT, as well as a list of possible solutions for identified issues with SWIFT." (*Id.*)

That summer, SSI representatives held several phone conferences with GE to discuss technical matters.  (Kopischke Dep. at 264-65.)  Based on the rudimentary nature of the questions GE was asking, it became clear to Garwood and Kopischke that, despite indicating there was already a SWIFT prototype, GE actually had very little understanding of SWIFT technology and had misrepresented its progress.  (*Id.* at 140-41.)  Kopischke reported that he and others at SSI felt "shocked" and "lied to" at this time.  (*Id.* at 140.)

SSI then began to "escalate [its] efforts to push GE" to "fulfill its promises." (2d Kopischke Decl. ¶ 16.)  Its efforts culminated in a meeting on August 29, 2014, in Waukesha, Wisconsin.  (*Id.* ¶ 17; Butler Decl. ¶ 48, Ex. 47 ("Meeting Report"), Sept. 10., 2018, Docket No. 271.)  At that meeting, Cunagin and Garwood told GE that SSI and its shareholders were disappointed that "expectations had been set and not fulfilled by GE." (Meeting Report at 3.)  They explained that the slow-moving pace at which GE had been running was no longer acceptable, and that SSI would be "exploring what rights SSI or the U of M had available to pressure GE into commercialization." (*Id.* at 3.)  Polzin and Ahluwalia acknowledged that things had not gone as originally expected, apologized, and cited market competition as GE's reason for prioritizing other projects.  (*Id.* at 3-4.)  Cunagin demanded a decision on how GE planned to move forward, and Polzin and

Ahluwalia told him that they would discuss SWIFT at the next senior management meeting. (*Id.* at 4; Kopischke Dep. at 222.)

On September 12, 2014, Polzin and Ahluwalia called SSI to report that they had brought SSI's concerns to senior management, including Dr. Richard Hausmann, GE Healthcare's CEO and President of Global MR business. (Kopischke Dep. at 226.) They told SSI that GE had decided to commercialize SWIFT and said it would begin implementation of a neuro application as soon as practicable. (Pl.'s Answer to Interrog. at 11.)

GE also asked SSI for help with putting together a SWIFT prototype on the September 12 call. (2d Kopischke Decl. ¶ 19.) SSI agreed to assist GE and subsequently found a company that had the experience to help the parties called HeartVista, Inc. (Pl.'s Answer to Interrog. at 6.) Kopischke also secured commitments to collaborate from several doctors, Stanford University, and other entities. (*Id.* at 7-8.) Securing these commitments took significant time and effort. (*See* Butler Decl. ¶¶ 52-65, Exs. 51-64, Sept. 10, 2018, Docket Nos. 274-87.) Kopischke then put together a "detailed proposal for a program to implement SWIFT on GE's MRI hardware." (Pl.'s Answer to Interrog. at 8; Butler Decl. ¶ 62, Ex. 61, Sept. 10, 2018, Docket No. 284.) Kopischke sent the proposal to GE on January 5, 2015. (Pl.'s Answer to Interrog. at 8.)

While Kopischke was working on the proposal, GE replaced Dr. Hausmann with Eric Stahre. (2d Kopischke Decl. ¶ 20.) In January 2015, Stahre reaffirmed GE's commitment to commercialize SWIFT. (*Id.*)

Kopischke continued to reach out to GE to ask about financing SWIFT commercialization through February 2015. (*See* Butler Decl. ¶ 65, Ex. 64, Sept. 10, 208, Docket No. 287.) GE did not take additional steps to move forward.

## IV. Procedural History

SSI filed an Amended Complaint on May 19, 2017. SSI brought four claims: (I) breach of contract (APA); (II) breach of the implied covenant of good faith and fair dealing; (III) breach of contract (post-APA agreements to commercialize SWIFT); and (IV) promissory estoppel. (Compl. at 8-10.) GE moved to dismiss Counts II-IV. (Mot. to Dismiss, June 2, 2017, Docket No. 24.) On January 17, 2018, the Court granted the motion to dismiss with respect to SSI's good faith and fair dealing claim. (Order at 11, Jan. 17, 2018, Docket No. 121.) The Court also found that the APA imposed no obligation to commercialize SWIFT. (*Id.* at 7-8.)

Presently before the Court is GE's motion for summary judgment on the remaining claims. (Mot. for Summary J., Sept. 10, 2018, Docket No. 199.) GE also presents two motions to exclude expert testimony. (Mot. to Exclude, Sept. 10, 2018, Docket No. 291; Mot. to Exclude, Sept. 20, 2018, Docket No. 303.) SSI presents one motion to exclude expert testimony. (Mot. to Exclude, Sept. 10, 2018, Docket No. 203.)

## DISCUSSION

## I. Motion for Summary Judgment

### A. Standard of Review

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

**B.      Count I–Breach of Contract (APA)**

The Court must address three issues arising out of SSI's first breach of contract claim: (1) the scope of GE's obligations under the APA; (2) whether GE met those obligations; and (3) whether SSI suffered damages as a result of GE's alleged breach.[3]

**1.      GE's Obligations under the APA**

This Court has already determined that the APA did not require GE to

_____

[3] As the Court will discuss below, the parties dispute whether the APA was later modified, giving rise to new promises. The Court's discussion of Count I addresses the APA only as originally written.

commercialize SWIFT technology.  Two potential points of contract ambiguity remain: (1) what constitutes "creation" of an ATD program; and (2) whether the contract may be read to require completion of an ATD program.

"The question of whether a contract is ambiguous is a question of law for the Court, but construction of an ambiguous contract becomes a fact question for the jury." *American S.S. Co. v. Hallet Dock Co.*, 862 F. Supp. 2d 919, 944 (D. Minn. 2012).  "A contract is ambiguous when 'it is reasonably susceptible of more than one interpretation.'" *Id.* (quoting *Thomsen v. Famous Dave's of Am., Inc.*, 606 F.3d 905, 908 (8th Cir. 2010).

Neither the APA nor GE's MR Guidance Document define "creation" of an ATD program.  GE argues that it created the ATD Program when it began phase T0 (as defined by the MR Guidance Document), where it identified specific tasks to be carried out and their owners.  SSI, on the other hand, asserts that the ATD Program was never created because GE did not create a SWIFT prototype and because GE never focused exclusively on SWIFT, but instead compared it to RUFIS.

Neither party's interpretation of the APA is unambiguously reflected in the language of the contract.  While the Court doubts that merely assigning tasks to employees was enough to fulfill GE's obligation to create the ATD Program, to identify a later phase of the Program as the contractual endpoint would require the Court to engage in guesswork. As such, the Court finds that, with respect to GE's obligation to create and/or complete the SWIFT ATD Program, the APA is ambiguous.  Because the scope of GE's obligations is ambiguous, the Court will not discuss whether GE satisfied those obligations.

## 2. Damages

Although material disputes of fact as to GE's obligations remain, summary judgment on SSI's APA claim may be appropriate if SSI fails to show that it suffered damages as a result of GE's alleged breach.

To succeed in a breach of contract claim, a plaintiff must show that the damages "result from (or [are] caused by) the breach." *Nguyen v. Control Data Corp.*, 401 N.W.2d 101, 105 (Minn. Ct. App. 1987). Expectation damages are measured by the amount that would "place the plaintiff in the same position as if the breaching party had complied with the contract." *Logan v. Norwest Bank Minn., N.A.*, 603 N.W.2d 659, 663 (Minn. Ct. App. 1999). Alternatively, reliance damages may be awarded "to place the non-breaching party in the position it would be in had the contract not been made." *Id.* (citing Restatement (Second) of Contracts § 344(b) (1981)).

Despite the Court's earlier finding that the APA did not require GE to commercialize SWIFT, SSI seeks expectation damages for loss of royalty payments that would have resulted from successful commercialization. But SSI has not shown that, had GE satisfied its obligations under the APA by creating or completing an ATD program, it would have chosen to commercialize SWIFT (or done so successfully). The APA requires that the decision to commercialize SWIFT be left **entirely** to GE's discretion. Thus, even if SSI can show that SWIFT technology is marketable, SSI cannot show that GE would have chosen to commercialize it upon completion of the ATD Program. The Court's task is to put SSI in the same position it would have been in had GE complied with the contract, not to speculate as to benefits that could have resulted from actions taken beyond the scope

of the parties' contractual obligations. *Logan*, 603 N.W.2d at 663. Because SSI has not shown that it would have received royalty payments had GE satisfied its obligations under the APA, the Court finds that SSI has not established expectation damages.

*Valley Paving, Inc. v. Stanley Consultants, Inc.*, 2016 WL 2615956, (Minn. Ct. App. May 9, 2016), which SSI relies on, does not change the result. There, the Minnesota Department of Transportation (MnDOT) sought bids from contractors for a highway-improvement project. *Id.* at *1. The defendant estimated the cost of the project, and the plaintiff used those estimates to submit a bid to MnDOT. *Id.* The plaintiff won the bid, but when the project was underway, learned that the defendant had underestimated the cost of the project significantly, resulting in a lower contract price from MnDOT. *Id.* at *2. Because the contract price was fixed and could not be raised even if the cost of performance exceeded it, the plaintiff suffered the loss. *Id.*

The plaintiff argued that, had the defendant notified it of the cost overruns earlier, it could have mitigated damages by seeking a price adjustment from MnDOT, implementing more efficient project management mechanisms, or seeking price adjustments from subcontractors. *Id.* While acknowledging that none of those measures would certainly have benefited the plaintiff, the court found that the plaintiff had met its burden to establish damages, noting that it "need only provide proof of a reasonable basis upon which damages can be estimated." *Id.* at *8.

The principles applied in *Valley Paving* would be useful if the present dispute involved the **amount** of damages at stake. Unlike SSI, the *Valley Paving* plaintiff could say with some certainty that damages existed; had the breach not occurred, it would have

taken action – such as implementing more efficient management techniques – that would have benefitted it financially. In contrast, here, had GE carried out the ATD Program, SSI would have been powerless to ensure its own financial gain. The Court does not read *Valley Paving* to address such a situation.

As an alternative to expectation damages, SSI asserts a claim for lost opportunity costs. Specifically, SSI asserts that had it not entered a contract with GE, it would have received royalty payments after it entered into a contract with Siemens. SSI relies on *Designer Direct v. Deforest Redevelopment Authority*, 368 F.3d 751 (7th Cir. 2004), where the court recognized lost opportunity costs as a form of reliance damages. That case, however, does not support SSI's argument that a plaintiff asserting a lost opportunity theory of damages need only show that "it was likely that a contract would have been entered into but for" the contract with the defendant. *Id.* at 752. The *Designer Direct* court dismissed the case because the plaintiff could not show that it would have entered an alternative contract; it did not recite a standard for proving lost opportunity damages. *Id.*

Even if SSI can show it would likely have entered into a contract with Siemens but for the contract with GE, it still must show that it would have profited from that relationship. The draft term sheet between SSI and Siemens from 2009 shows that SSI negotiated with Siemens and that both parties contemplated a contract that **might** include royalty payments upon commercialization of SWIFT. Like the APA, however, that document does not **require** that Siemens commercialize SWIFT. As such, the Court finds that SSI's claim to lost opportunity damages is as speculative as its claim for expectation damages.

Because SSI cannot show that it suffered damages as a result of GE's alleged breach, the Court will grant summary judgment for GE on Count I.

## C.       Count III–Breach of Post-APA Agreements

SSI asserts that following the execution of the APA, GE and SSI entered new contracts in which GE promised to commercialize SWIFT.  SSI argues that such contracts were formed on three occasions: (1) at the RSNA conference in November 2011; (2) at the ISMRM conference in April 2013; and (3) in September 2014, following the meeting in Waukesha, Wisconsin.  Before addressing the merits of the alleged contracts, the Court must determine whether the APA's integration clause precludes formation of post-APA contracts and whether SSI's claims are barred by the Statute of Frauds.

### 1.       The APA's Integration Clause

Because the APA's integration clause requires modifications to be in writing, GE asserts that any oral modification–including a promise to commercialize–is invalid.[4]  GE is mistaken.  Minnesota follows the common law rule that "a written contract can be varied or rescinded by oral agreement of the parties, even if the contract provides that it shall not be orally varied or rescinded." *Larson v. Hill's Heating and Refrigeration of Bemidji, Inc.*, 400 N.W.2d 777, 781 (Minn. Ct. App. 1987) (citing *Lamberton v. Connecticut Fire*

---

[4] The parties dispute whether the alleged post-APA agreements are subsequent and separate from the APA or modifications to it.  Because it is not dispositive, the Court will not discuss that issue.

*Insurance Co.*, 39 Minn. 129 (1888)).  As such, the integration clause does not preclude SSI and GE from modifying their contract.

### 2.     The Statute of Frauds

Minnesota requires that agreements "not to be performed within one year from the[ir] making" be in writing.  Minn. Stat. § 513.01(1).  GE argues that the alleged post-APA agreements are subject to the provisions of the APA and that, by its terms, the APA could not be performed within a year of the closing date.  In support, GE cites to paragraph 9.1 of the APA, which reads: "'Additional Payment Period' means the period beginning on the Closing Date and . . . if the total aggregate Additional Payments [royalties] payable under this Agreement equals or exceeds fifty million dollars on the tenth anniversary of the Closing Date, ending on the tenth anniversary of the closing date."  GE argues that this provision establishes a minimum term for performance.

The Court disagrees.  Instead of establishing a minimum term for performance, paragraph 9.1 merely explains how an additional payment period would proceed if GE successfully commercialized SWIFT.  Thus, even if the alleged post-APA agreements are subject to the APA's provisions, they are not barred by the Statute of Frauds.

### 3.     The Agreements

The Court must now address whether the alleged post-APA promises are enforceable.   A promise is enforceable as a contract when there is offer, acceptance and consideration.  *Murray v. MINNCOR*, 596 N.W.2d 702, 704 (Minn. Ct. App. 1999) (citing *Cederstrand v. Lutheran Brotherhood*, 263 Minn. 520, 530-31 (1962)).  Consideration

"means a negotiation resulting in the voluntary assumption of an obligation by one party upon condition of an act or forbearance by the other." *Cederstrand*, 263 Minn. at 530. "Consideration . . . must be something which both parties to the contract have adopted and regarded as such." *Suske v. Straka*, 229 Minn. 408, 414 (1949) (internal citations omitted).

### i. The September 2014 Agreement

The parties first dispute whether, during their conversation on September 12, 2014, there was mutual assent to commercialize SWIFT. The parties also dispute whether SSI gave consideration for GE's promise.

During the meeting between SSI and GE representatives on August 29, 2014, SSI communicated to GE that if commercialization did not move forward, SSI would pursue its legal options. GE leadership then met independently, considered its options, and on September 12, called SSI to explain that it had decided to commercialize SWIFT. During that call, Mr. Kopischke reiterated that SSI was looking for a clear plan and commitment, and GE indicated its understanding. While the precise scope of the agreement may yet be unclear, the Court finds it likely that, at the very least, the parties understood they had an agreement to pursue commercialization.[5]

There is also ample evidence of consideration. During the conversation on September 12, GE expressed reluctance about commercializing unless SSI agreed to assist

---

[5] GE also asserts that the 2014 agreement (and the other alleged post-APA agreements) lack essential terms and are therefore unenforceable. *See Druar v. Ellerbe & Co.*, 24 N.W.2d 820, 826 (Minn. 1946) (internal citations omitted). Although the parties did not agree to a specific timeline and various specifics were apparently not discussed, the agreement is not "so vague, indefinite, and uncertain as to place the meaning and intent of the parties in the realm of speculation." *King v. Dalton Motors, Inc.*, 109 N.W.2d 51, 52 (Minn. 1961).

with developing a plan. Eager to move forward, SSI agreed to assist GE and, in the following months, expended substantial resources to develop a proposal. SSI has also shown that GE's September 2014 promise induced it to forego legal action.

As such, the Court finds that genuine issues of material fact exist surrounding the alleged September 2014 agreement. The Court will therefore deny summary judgment for GE on Count III.

### ii. The Fall 2011 and April 2013 Agreements

SSI asserts that the GE representatives' alleged promises to commercialize SWIFT at the 2011 RSNA and 2013 ISMRM conferences also gave rise to contracts. Because the Court has already determined that GE is not entitled to summary judgment on Count III based on the 2014 promise, it will discuss these alleged promises only briefly.

While there are reasons to doubt that GE's statements in 2011 and 2013 gave rise to enforceable agreements, the Court finds that genuine disputes of fact exist with respect to both. Kopischke attested that, after being confronted with SSI's disappointment at the RSNA conference in 2011, GE responded by promising SSI that it would pursue commercialization of SWIFT and intended to be bound by that promise. Cunagin corroborated Kopischke's recollection of events in the letter he sent to SSI shareholders shortly after the RSNA conference, where he described GE's assurances that "SWIFT [would] play a key role in quiet MRI." (2d Kopischke Decl. ¶ 9, Ex. K2 at 3, Oct. 15, 2018, Docket No. 349.) Although GE contends that it did nothing more than casually reassure SSI, a reasonable jury could find otherwise.

Likewise, a jury could find that Coumons, Polzin, and Ahluwalia made a promise at the ISMRM conference in 2013 when they told SSI not to worry because GE would commercialize SWIFT "as soon as practicable."  (Pl.'s Answer to Interrogg. at 8-9.) Polzin's and Ahluwalia's call to SSI following the conference, where they asked for assistance from SSI in running SWIFT on MRI hardware, suggests that GE may have considered itself bound to at least attempt commercialization following the ISMRM conversations.  This request–and Kopischke's subsequent assistance to GE employees in identifying solutions for GE's issues with SWIFT–is also evidence of consideration.

### D.      Count IV–Promissory Estoppel

To state a claim for promissory estoppel, a plaintiff must show that: "(1) there was a clear and definite promise; (2) the promisor intended to induce reliance and such reliance occurred, and (3) the promise must be enforced to prevent injustice."  *Park Nicollet Clinic v. Hamann*, 808 N.W.2d 828, 834 (Minn. 2011).

GE argues that summary judgment is appropriate on SSI's promissory estoppel claim for two reasons: (1) SSI has not shown it suffered any reliance damages as a result of GE's purported promises; and (2) GE did not make a clear and definite promise with the intent to induce reliance on the part of SSI.

GE's argument on reliance damages fails for two reasons.  First, Minnesota does not limit damages under promissory estoppel to reliance damages. *See, e.g., Walser v. Toyota Motor Salies, U.S.A., Inc.*, 43 F.3d 396, 401 (8th Cir. 1994) (finding that Minnesota courts have adopted Section 90 of the Restatement (Second) of Contracts, which states that

damages for promissory estoppel **may be limited** to reliance damages).  Thus, the Court may determine that the interests of justice allow SSI to assert expectation damages. Second, SSI **has** presented evidence of reliance damages.  SSI expended significant resources following GE's oral promises to commercialize, particularly in its work with Stanford and HeartVista in 2014.

Finally, for the same reasons discussed in Section C, *supra*, SSI has presented evidence sufficient to allow a jury to find that GE made clear and definite promises to SSI to commercialize SWIFT.  As such, the Court will deny GE's motion for summary judgment on SSI's promissory estoppel claim.

## II.     Motions to Exclude Expert Testimony

### A.     Standard of Review

Expert testimony is governed by Federal Rule of Evidence 702.  Rule 702 provides the following:

> A witness who is qualified as an expert by knowledge, skill experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods;
> (d) the expert has reliably applied the principles and methods to the factors of the case.

The district court acts as a gate keeper to ensure that the requirements of Rule 702 are met.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).

In *Daubert*, the Supreme Court set out four non-exclusive factors for assessing the reliability of expert testimony: (1) whether the theory or technique can be, and has been tested, (2) whether it has been subjected to peer review, (3) whether it has a known or potential error rate, and (4) whether it is generally accepted in the scientific community. *Id.* at 593-94.

The Eighth Circuit has held that "[c]ourts should resolve doubts regarding the usefulness of an expert's testimony in favor of admissibility." *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758; *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) ("[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."). "Only if an expert's opinion is 'so fundamentally unsupported that it can offer no assistance to the jury' must such testimony be excluded." *Hose v. Chi. Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1996) (quoting *Loudermill v. Dow Chem. Co.*, 863 F.2d 566, 570 (8th Cir. 1988)).

## B.    SSI's Motion to Exclude Expert Testimony

SSI moves to exclude certain expert testimony of Dr. Bruce Rosen and Mark Gallagher.  (Mot. to Exclude, Sept. 10. 2018, Docket No. 203.)  Dr. Rosen is a radiologist and medical physicist with 35 years' experience at Massachusetts General Hospital.  (2d Decl. of Paul Robbennolt ("2d Robbennolt Decl.") ¶ 2, Sept. 10, 2018, Docket No. 208, Ex. 1 ("Rosen Report") at 4, Docket No. 209.)  GE has chosen him as a technical expert. Mark Gallagher works for Willis Towers Watson North America as a Director in Forensic Accounting and Complex Claims, and GE has chosen him as a damages expert.  (2d Robbennolt Decl. ¶ 3, Ex. 2 ("Gallagher Report") at 3, Docket No. 210.)

SSI first seeks to exclude Dr. Rosen's opinions that: (1) GE created, in accordance with its policies and procedures, an ATD program with respect to SWIFT technology; (2) GE conducted the ATD program; and (3) the ATD program met the definition of an ATD program set forth in the APA. SSI contends that Dr. Rosen did not apply expertise in forming these opinions and that his testimony is not necessary to help a jury determine whether an ATD program was created.

The Court disagrees. Dr. Rosen relied on his expertise in radiology to assess the processes and context surrounding GE's ATD program. Moreover, because of the complex technology underlying this dispute, the Court finds that expert testimony would be useful in helping the jury to interpret documents produced leading up to or during the ATD process. As such, the Court finds Dr. Rosen's testimony on the ATD program to be admissible.

Dr. Rosen also opines that SWIFT would have been more costly to commercialize than RUFIS. He states that, while it took GE two years to commercialize RUFIS, "[i]t would have taken GE at least that long to commercialize SWIFT, and likely longer and with greater cost due to the significantly more substantial hardware and software changes that SWIFT required." (Rosen Report at 23.) SSI seeks to exclude this opinion on the basis that is "so fundamentally unsupported that it can offer no assistance to the jury." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929-930 (8th Cir. 2001).

SSI takes Dr. Rosen's statement out of context. Dr. Rosen prefaces his statement with a detailed explanation of the technical hurdles that would accompany SWIFT commercialization, including hardware and software modifications. (*See* Rosen Report at

13-22.) He also interprets GE documents showing that more substantial changes would be needed to implement SWIFT as compared to RUFIS. (*Id.* 19-20.) As such, Rosen offers ample support for his opinion regarding the respective costs of the SWIFT and RUFIS technologies, and the Court finds no basis to exclude it.

SSI next seeks to exclude Mr. Gallagher's opinion on the hypothetical demand for SWIFT products. SSI asserts that the opinion is without factual support and that Mr. Gallagher lacks the requisite expertise on MRI hardware and manufacturing costs to testify.

The Court finds no issues with Mr. Gallagher's competence or the factual support behind his opinions. His expertise in accounting qualifies him to discuss market demand. In discussing market demand, he properly relies on the expertise of Dr. Rosen for needed information about the cost of SWIFT commercialization.

Finally, SSI seeks to exclude Mr. Gallagher's testimony that, if GE had commercialized a hypothetical SWIFT product, it would have replaced that product with an alternative silent MRI technology by 2021. SSI argues that because GE successfully moved to prevent SSI from taking discovery on alternative silent MRI technologies other than RUFIS, it would be unfair to allow Mr. Gallagher to opine on the impact those alternative technologies might have on a SWIFT product.

The Court disagrees. SSI presents a theory of damages involving royalty payments into the 2020s; as such, it is fair to allow GE to present evidence refuting SSI's calculations.

Accordingly, the Court will deny SSI's motion to exclude the expert testimony of Dr. Rosen and Mr. Gallagher.

### C.    GE's Motions to Exclude Expert Testimony

GE moves to exclude the expert testimony of Dr. Jurgen Hennig, Dr. Michael Garwood, and Donald Gorowsky. (Mot. to Exclude, Sept. 10, 2018, Docket No. 291; Mot. to Exclude, Sept. 20, 2018, Docket No. 303.)

Dr. Hennig is a professor and Co-Chair of the Department of Diagnostic and Therapeutic Radiology at the University Medical Center in Freiburg, Germany. (2d Decl. of Maria Butler ¶ 2, Sept. 10, 2018, Docket No. 295, Ex. 1 at 3, Docket No. 296.) He has over thirty years' experience in MRI research and has received extensive recognition for his work in the field. (*Id.*) SSI retained Hennig to describe SWIFT and RUFIS technologies and to offer an opinion on the feasibility of implementing SWIFT on GE scanners.

GE presents various arguments to support exclusion of Dr. Hennig's testimony, which can be summarized as follows: (1) Dr. Hennig is not qualified to testify on the feasibility of implementing SWIFT on GE scanners; (2) his opinions are not sufficiently supported by facts and analysis to be reliable or helpful to the jury; and (3) he offers opinions that require no specialized knowledge.

None of GE's arguments has merit. First, given his extensive experience with MRI scanners, knowledge of physics, and indirect experience with SWIFT technology, Dr. Hennig is qualified to testify on the implementation of SWIFT on GE scanners. Second, Dr. Hennig cites various sources of support for each of his opinions, including his detailed professional knowledge of the MRI technology available in 2011, his understanding of industry standards, a review of GE's internal documents, and analyses carried out by other

experts. Even without direct experience with SWIFT or GE scanners, his opinions would undoubtedly be helpful to a jury. Finally, each of his opinions–including his opinion as to what GE should have understood about its own MR scanners when it entered the APA–is based to some extent on specialized knowledge of the MR industry.

Similarly, GE seeks to exclude Dr. Garwood's testimony on the ease of implementing SWIFT because he lacks experience with GE's scanners. Because Dr. Garwood has extensive experience with SWIFT and MR scanners, his opinions are sufficiently supported. To the extent GE contests factual and non-expert testimony that Dr. Garwood may offer, the Court sees no reason to preclude Dr. Garwood from testifying as a fact witness given his role in the events leading up to this dispute.

GE also seeks to exclude the testimony of SSI's damages expert, Donald Gorowsky, who offers opinions on lost past and future royalty payments under the post-APA agreements. (*See* 3d Decl. of Marla Butler ¶ 2, Sept. 10, 2018, Docket No. 307, Ex. 1 at 19-29, Docket No. 308.) GE argues that there is no basis for Gorowsky's use of the APA's payment provisions in calculating damages pursuant to the post-APA contracts. The Court is not persuaded. Even if the APA's payment provisions do not apply to the oral contracts, those provisions provide a reasonable proxy upon which Mr. Gorowsky may base his opinion.

GE next disputes Gorowsky's use of silent scan sales as a proxy for SWIFT sales, arguing that his method is based on flawed assumptions about what GE would have done had it commercialized SWIFT. Gorowsky bases his conclusions on knowledge of the market and on testimony of SSI's experts regarding the features of RUFIS and SWIFT

technologies.  While GE may highlight Gorowsky's assumptions to attack his credibility, the Court does not find his conclusions so devoid of factual support that they should be excluded.

Finally, GE seeks to exclude testimony Gorowsky may offer on damages under SSI's promissory estoppel claim.[6]  GE asserts that because Gorowsky offers no opinion on reliance damages and damages under promissory estoppel claims are typically limited to reliance damages, his testimony is inapplicable.  However, Minnesota law allows for expectation damages in promissory estoppel cases.  As such, to the extent Gorowsky's testimony is offered to support damages under SSI's promissory estoppel claim, it is relevant.

Accordingly, the Court will deny GE's motions to exclude expert testimony in full.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Defendant's Motion for Summary Judgment [Docket No. 199] is **GRANTED** in part and **DENIED** in part;

2. Plaintiff's Motion to Exclude Expert Testimony [Docket No. 203] is **DENIED**;

---

[6] GE also disputes Gorowsky's testimony on damages related to SSI's lost opportunity theory. Because the Court will grant summary judgment for GE on Count I, the only claim for which it offers a lost opportunity costs theory of damages, any issues surrounding Gorowsky's testimony on the theory are moot.

3. Defendant's Motions to Exclude Expert Testimony [Docket Nos. 291, 303] are

   **DENIED.**


DATED:  April 4, 2019                    _____
at Minneapolis, Minnesota.                        JOHN R. TUNHEIM
                                                     Chief Judge
                                              United States District Court