UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

STEADY STATE IMAGING, LLC,

          Plaintiff,

Civil No. 17-1048 (JRT/TNL)

v.

**MEMORANDUM OPINION AND ORDER GRANTING JUDGMENT FOR PLAINTIFF**

GENERAL ELECTRIC COMPANY,

          Defendant.

Devan V. Padmanabhan, Paul J. Robbennolt, Britta S. Loftus, and Michelle Dawson, **PADMANABHAN & DAWSON, PLLC**, 45 South Seventh Street, Suite 2315, Minneapolis, MN 55402, for plaintiff.

Steven A. Block, **THOMPSON HINE LLP,** 20 North Clark Street, Suite 800, Chicago, IL 60602; Jeffrey R. Moore, **THOMPSON HINE LLP**, 3900 Key Center, 127 Public Square, Cleveland, OH; Jonathan Nussbaum and Marla Butler, **THOMPSON HINE LLP**, 3560 Lenox Road Northeast, Suite 1600, Atlanta, GA 30326; Jamar T. King, **THOMPSON HINE LLP**, 10050 Innovation Drive, Suite 400, Miamisburg, OH 45342, for defendant.

In 2011, Steady State Imaging, LLC ("Steady State") and General Electric Company ("GE") entered into an Asset Purchase Agreement ("APA") regarding the commercialization of SWIFT technology, a magnetic resonance imaging technique developed by Dr. Michael Garwood and to which Steady State had a right to license. SWIFT was never commercialized by GE. Steady State brought this action in April 2017, and after the Court's Order on Summary Judgment, Steady State's breach of an oral

contract[1] and promissory estoppel claims remained.  *Steady State Imaging,* 2019 WL 1491934, at *7–9.

These claims proceeded to a jury trial.  On April 27, 2022, the jury rendered a verdict finding that Steady State had proved all the elements of promissory estoppel by a preponderance of the evidence.[2]  (Jury Verdict, Apr. 27, 2022, Docket No. 582). Specifically, the jury found that (1) GE made a clear and definite promise to commercialize SWIFT technology in a Silent Brain application; (2) GE intended to induce Steady State to rely on the promise; (3) Steady State reasonably relied on the promise; and (4) Steady State had losses or was disadvantaged because it relied on GE's promise.  (Final Jury Inst., May 4, 2022, Docket No. 590).  The jury found that the promise could be fully performed within one year.  (Jury Verdict at 3).  As such, the jury awarded Steady State damages of $10 million.  (*Id.*)

Under Minnesota law, before a judgment can be enforced under a theory of promissory estoppel, the Court must determine, as a matter of law, whether the promise or promises should be enforced to prevent injustice.  As enforcement of the promise will prevent an injustice, the Court will enforce the promises GE made and enter judgment for Steady State against GE in the amount of $10 million.

---

[1] The Court found that the APA did not obligate GE to commercialize SWIFT technology. *Steady State Imaging, LLC v. Gen. Elec. Co.*, No. 17-1048, 2019 WL 1491934, at *1, 7 (D. Minn. Apr. 4, 2019).

[2] The jury found that there was no enforceable oral contract.  (Jury Verdict at 1.)

**DISCUSSION**

"A claim for promissory estoppel has three elements: (1) Was there a clear and definite promise? (2) Did the promisor intend to induce reliance, and did such reliance occur? (3) Must the promise be enforced to prevent injustice?" *Housing & Redevelopment Auth. of Chisholm v. Norman*, 696 N.W.2d 329, 336 (Minn. 2005). "The injustice factor is a question of law that the court must decide." *Faimon v. Winona State Univ.*, 540 N.W.2d 879, 883 (Minn. Ct. App. 1995).

The Minnesota Supreme Court has clarified that "the test [for the third element] is not whether the promise should be enforced to do justice, but whether enforcement is required to prevent an injustice." *Cohen v. Cowles Media Co.*, 479 N.W.2d 387, 391 (Minn. 1992). The Court may take into consideration factors such as the reasonableness of the promisee's reliance and public policy factors in favor of enforcing bargains and preventing unjust enrichment. *Faimon*, 540 N.W.2d at 883. The Court may also look to the "definite and substantial character" of the promise in relation to the remedy sought, the "formality with which the promise is made," and whether the "evidentiary, cautionary, deterrent and channeling functions of form" are furthered through enforcement of the promise. *Id.* at 383 n.2 (citing Restatement (Second) of Contracts § 90.1 cmt. b (1981)). "[I]t is easier to recognize an unjust result than a just one, particularly in a morally ambiguous situation." *Cohen*, 479 N.W.2d at 391.

**A. The Reasonableness of Steady State's Reliance**

The jury made a factual finding that Steady State's reliance was reasonable. GE argues that the Court should reach the opposite conclusion. GE argues this is so because (1) GE heavily negotiated the right to not commercialize SWIFT under the APA and it would be counter to common sense to take on the additional obligation of commercializing SWIFT absent additional benefits; (2) the September 2014 promise did not conform to the terms of Steady State's own ultimatum and GE explicitly rejected Steady State's counter-promise as it believed Steady State had no right to sue; and (3) the oral promises were contradictory to the written language in the APA. The jury reviewed evidence and heard lawyer argument during trial on GE's first two reasons supporting a finding of unreasonableness. The jury was not persuaded, and neither is the Court.

Steady State presented evidence that demonstrated circumstances had changed since the negotiation of the APA—GE had launched quiet imaging with RUFIS. (Trial Tr. at 1633:18–20.) It was not wholly unreasonable for Steady State to believe the changed circumstances made GE reconsider taking on additional obligations to commercialize SWIFT. There was also evidence in the record regarding purported legal actions Steady State would take against GE if it did not commercialize SWIFT, lending credence to the notion that it was reasonable for Steady State to believe threat of legal action propelled GE into taking on additional obligations. (Trial Tr. at 1482:1–4.)

Furthermore, GE's assertion that Steady State was unreasonable because it relied on a "vague statement" from GE is entirely contrary to the jury verdict finding GE made a clear and definite promise to commercialize SWIFT. And to be clear, GE's September 2014 promise did not need to conform to Steady State's proposed terms nor did GE need to agree that Steady State had a right to sue GE. Neither of these things are required in assessing reasonableness. GE is conflating contract requirements with promissory estoppel; the legal theories are distinct. Because the promise may not have conformed to contract principles does not mean it was unreasonable for Steady State to rely upon. GE has not identified a single case that would support its assertions.

Additionally, the Court must again consider GE's argument that Steady State's reliance was unreasonable because the post-APA promises allegedly directly contradict the express terms of the APA. GE presented this argument to the Court in its motion for judgment as a matter of law. (Def.'s Mem. Supp. Mot. J. Matter of L. at 24–25, Apr. 19, 2022, Docket No. 567.) The Court, in open court, denied that motion twice. (Trial Tr. at 1824–26; Trial Tr. at 2417.) Though the Court did not expressly reject this specific argument, it declined to hold as a matter of law that reliance on the promise was unreasonable.

The Court now makes clear that this argument is meritless. The APA did not state that GE would never commercialize SWIFT, only that it had sole discretion as to the commercialization process. The subsequent promise to commercialize SWIFT is not

5

contrary to this provision, but is rather in addition to the obligations GE originally undertook under the APA. "[R]eliance on an oral representation was unjustifiable as a matter of law **only if** the written contract provision explicitly stated a fact **completely contradictory** to the [statement]" *Johnson Bldg. Co. v. River Bluff Dev. Co.*, 374 N.W.2d 187, 194 (Minn. Ct. App. 1985) (emphasis added). The contract provision was not completely contradictory to the promises to commercialize SWIFT.

In sum, the jury determined that Steady State's reliance was reasonable. The Court agrees with the jury's assessment. As such, reasonableness of reliance weighs in favor of enforcing the promise to prevent injustice.

### B. Formality and Definite and Substantial Character

The jury found that GE made a clear and definite promise to commercialize SWIFT. The question now, though, before the Court, is informed by the jury verdict but is not governed by it. The Court is not re-evaluating the first element of promissory estoppel, but rather is looking to the formality and definite and substantial character of the promises as a factor in determining whether the promise should be enforced to prevent injustice. It is also important to note that the jury did not specify which of the several promises GE made to Steady State must be enforced, or if all must be enforced. Thus, the Court will look at the formality, definiteness, and substantiality of each promise.

As to the formality of the promises, the only promise communicated in a semi-formal setting was the September 2014 promise from Polzin and Ahluwalia to Cunagin.

The promise was made after the parties had met in person and Steady State had given GE an ultimatum to either commercialize SWIFT or be taken to court. (Pl's Tr. Ex. 24; Trial Tr. at 1468:18–1469:12.) GE then internally met to discuss the ultimatum and called Steady State in September 2014 to communicate its decision. (Trial Tr. at 2159:1–10; 2160:6–24.) The promise made on that phone call was sufficiently formal, it was in response to a formal meeting where next steps were discussed, the phone call was planned between the interested parties, and important information was expected to be and was shared. Though GE would argue that only promises made in writing, such as through the APA, are formal, the reality is that there exists a variety of scenarios in which parties may consider a promise formal even if it is not reduced to writing. GE has provided no case law which stands for the proposition that only written agreements can be considered formal, and the Court will not hold as such here. The Court does agree with GE, however, that the other promises made during trade shows were not communicated in formal settings.

All of the promises were of a definite and substantial nature. At RSNA 2011, GE told Steady State "don't worry . . . we're going to follow with SWIFT . . . we're committed, you know, we're going to launch a SWIFT product." (Trial Tr. at 1425:1–16; 271:4–8.) This constitutes a definite promise to launch (i.e. commercialize) a SWIFT product and this promise was substantial in that it would result in significant revenue streams for Steady State.

At ISMRM 2013, the promises certainly were less definite and substantial than the ones made at RSNA 2011, but they are still sufficient.  GE communicated it was "moving forward with SWIFT," that Steady State would "make a lot of money" and that there was "no need to worry" about the commercialization of SWIFT.  (Trial Tr. at 283:8–16; 298:16–17; 1453:11–15; 654:24–655:19.)  The Steady State witnesses all testified that they believed these statements were made to indicate that GE was going to commercialize SWIFT.  (Trial Tr. at 298:15–299:1; 1454:3–7; 655:19–656:3.)[3]  Out of context, the promises may appear indefinite as it is unclear from the statements alone why Steady State would make a lot of money or why there was no need to worry.  But context shows that these statements were made in regard to the commercialization of SWIFT.  For example, Coumans' statement to Garwood that he need not worry was in response to Garwood expressing his concern that GE would not move forward with SWIFT.  (Trial Tr. at 655:14–19.)  Given the context, the promises become more definite and are also substantial for the reason stated above.

Lastly, the September 2014 promise was definite and substantial.  In response to the August 2014 Ultimatum, GE communicated to Steady State that it had discussed the

---

[3] To be clear, the jury has already assessed the credibility of the witnesses and accredited the testimony of the Steady State witnesses.  The Court cannot, now, alter that assessment, particularly so because the credibility of witness testimony is not a determination for the Court to make.  *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004).  Therefore, the Court places particular importance on the Steady State witnesses' testimony regarding these conversations and their testimony as to what they understood was being communicated to them at that time.

issue internally and decided to move forward with SWIFT. (Trial Tr. at 1481:8–14.) This promise was made in response to Steady State expressing its frustration that SWIFT had yet to be commercialized and threatening to take legal action if GE did not promise to implement the technology. (Trial Tr. at 1468:18–1469:12.) GE responded by making the definite promise to continue moving forward with SWIFT.[4]

In total, while many of the promises were not made in a formal setting, they were all of a definite and substantial character. Furthermore, the September 2014 promise, a very significant promise in the parties' ongoing relationship, was made in a formal setting. This factor, then, weighs slightly in favor of enforcing the promises.

### C. The Evidentiary, Cautionary, Deterrent and Channeling Functions of Form

GE asserts that this factor weighs in favor of not enforcing the promise because there was no conduct to caution against or deter. First, GE claims that *Doran Development, LLC v. Southeast Properties* stands for the proposition that unconscionable conduct is required in order to enforce a promise to prevent an injustice. But the court in *Doran* analyzed unconscionable conduct as it related to the statute of frauds, not the

---

[4] GE cites several cases which, it claims, include statements that are similar to the ones made herein but where the courts found the statement was not definite or substantial. But the courts in each of the cited cases were not analyzing the definiteness and substantiality of a promise under the third element of promissory estoppel. Rather, they were considering the first element of promissory estoppel—whether the promise was clear and definite. *Spice Corp. v. Foresight Mktg. Ptnrs, Inc.*, No. 07–4767, 2011 U.S. Dist. LEXIS 147278, at *47 (D. Minn. Dec. 22, 2011); *Rudd v. Great Plains Supply*, 526 N.W.2d 369, 372 (Minn. 1995); *Bariball v. Langer*, No. A11–1682, 2012 WL 3262969, at *4 (Minn. Ct. App. Aug. 6, 2012). While the analysis may seem, at first glance, to be the same and of the same nature, it is distinct.

9

third element of promissory estoppel. There the court held that the "district court did not abuse its discretion when it concluded that promissory estoppel did not take the verbal settlement agreement out of the statute of frauds." No. A16–1091, 2017 WL 2062055, at *4 (Minn. Ct. App. May 15, 2017). Unconscionable conduct can be considered when reviewing the third element of promissory estoppel, but it is by no means dispositive.

GE also claims that there is no record evidence that it intentionally assumed an enforceable obligation to commercialize SWIFT in any post-APA communication with Steady State. GE asserts that the evidence shows only that GE made statements to further explore SWIFT and that Steady State misinterpreted those statements as enforceable promises. It argues that this Court has already held that the obligations resulted from "confusion, miscommunication [and] misunderstanding" between the parties so there was no conduct to caution against or deter.

To be clear, the Court used the phrase "confusion, miscommunication [and] misunderstanding" in its ruling on unconscionability under the statute of frauds. (Trial Tr. at 2381:1–8.) GE attempts to expand the Court's statement to now argue that it never intentionally made any promises to commercialize SWIFT, and that the enforceable promises were a result of simple confusion, miscommunication, and misunderstanding. This argument blatantly ignores the factual findings made by the jury to the contrary. The jury returned a verdict that GE intentionally made a clear and definite promise to

commercialize SWIFT with the intent that Steady State would rely on that promise and that Steady State is entitled to damages as a result. The Court, on this motion, is not revisiting the question of whether GE intentionally assumed an obligation to commercialize SWIFT, only whether the Court should enforce that obligation to prevent injustice. The jury findings make clear that GE's promises were not the result of "confusion, miscommunication [and] misunderstanding" and as such, there is conduct to caution against or deter.

GE made clear and definite promises with the intent to induce Steady State's reliance on those promises and in the hopes that Steady State would forego legal action. Steady State did reasonably rely on that promise, and Steady State was damaged as a result. GE should not be able to engage in such conduct without consequence. Enforcing this promise would serve a cautionary and deterrent function for similar conduct in the future, whether by GE or another entity. As such the cautionary and deterring functions weigh in favor of enforcing the promise to prevent injustice.

**D. Public Policy**

The Court may take into consideration the public policy factors in favor of enforcing bargains and preventing unjust enrichment. *Faimon*, 540 N.W.2d at 883. This factor weighs in favor of enforcing the promise. The jury found that GE made a clear and definite promise to commercialize SWIFT, GE intended to induce Steady State's reliance on that promise, Steady State did reasonably rely on the promise, and because of that reliance,

Steady State was damaged in the amount of $10 million. Steady State refrained from taking legal action to either sue GE or reacquire the rights to SWIFT as a result of GE's promises. (Trial Tr. at 1475:19–1476:1; 1482:1–4.)

Promissory estoppel creates an enforceable legal obligation absent a contract, or in other words, a bargain. Though GE argues to the contrary, it did receive a benefit from making the promises. Because Steady State refrained from taking any legal action, which included attempting to reacquire the rights to SWIFT, GE was able to gain a competitive advantage in the field of quiet MRI.[5] (Pl's Ex. 61; Trial Tr. at 1610:21–24; 1613:18–19.) It is irrelevant that GE made no money through launching a SWIFT product because it had already obtained a significant benefit by being the first company to launch quiet MRI. If the promise is not enforced, GE would reap these advantages without having to pay for them.

GE's argument that public policy actually requires the Court to not enforce the promise misses the mark. GE claims that the Court should decline to enforce the post-APA promises because it would allow Steady State to escape the consequences of the APA and strip GE of the benefit of its bargain to not commercialize SWIFT under the APA. Further, GE claims that Steady State would actually be unjustly enriched because it would

---

[5] Steady State argues that in addition to harming Steady State, Garwood's career was harmed as a result of GE's promises. GE vehemently contests this assertion that Garwood's career was hurt in any way. The Court need not address whether Garwood's career was harmed because the jury has found that Steady State itself was harmed and that alone sufficiently tips the public policy considerations in favor of enforcement of the promise.

receive an additional $10 million for the assets of SWIFT without any further benefits conferred to GE. But the post-APA promises have always been separate from the APA, and were made in addition to the obligations undertaken by GE under the APA. Furthermore, GE received several benefits as a result of those promises as already discussed.

Lastly, GE's argument that it was not foreseeable that GE would be obligated to provide any financial compensation to Steady State under the post-APA promises completely ignores the provisions of the APA. GE has strangely argued throughout this litigation that the royalty terms of the APA did not apply to the post-APA promises. It is undisputed that there were no payment terms discussed in the post-APA promises. However, neither party has ever contested that the APA was, at all times, an enforceable contract between the parties. Had GE commercialized SWIFT, as a jury held it promised to do post-APA, the royalty streams of the APA would have kicked in regardless of the existence of the post-APA promises. GE has not pointed to any clause in the APA which claims the royalty streams are no longer available if GE subsequently obligated itself to commercialize SWIFT. The only condition precedent to entitlement to the royalty streams was commercialization of SWIFT. Whether GE had an obligation to commercialize SWIFT under the post-APA promises is irrelevant to whether Steady State was entitled to royalty streams. GE agreed to commercialize SWIFT, Steady State would have received royalty

streams if GE had upheld its promise, GE broke that promise, and Steady State was damaged.

In sum, GE made an enforceable promise to Steady State, which Steady State reasonably relied upon to its detriment. Public policy considerations inform the Court that it should enforce this bargain and prevent any unjust enrichment as GE received several benefits by making the enforceable promise that should not be obtained without cost.

## CONCLUSION

In sum, after considering all the factors discussed above, the Court will enforce GE's promise to commercialize SWIFT to prevent injustice. GE has failed to point to any compelling need in this case to break that promise. Steady State has made clear how failing to enforce the promise would result in an injustice done to it. GE has not demonstrated the same. Because Steady State has shown that enforcement is required to prevent an injustice, the Court finds the third element of promissory estoppel met. As such, the Court will enter judgment against GE in the amount of $10 million under a theory of promissory estoppel as determined by the jury verdict and this Order.

**ORDER**

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that judgment be entered for Plaintiff against Defendant in the amount of $10 million.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  August 3, 2022
at Minneapolis, Minnesota.

_____
JOHN R. TUNHEIM
Chief Judge
United States District Court